UNITED STATES, Appellee

v

RONALD E. KELLY, Private E–2, U. S. Army, Appellant

7 USCMA 218, 22 CMR 8

No. 8165

Decided August 3, 1956

 ██

*First Lieutenant James L. Gault* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel James M. Scott* and *First Lieutenant Philip L. Evans.*

*First Lieutenant Robert L. Taylor* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant John W. Dailey, Jr.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Charged with larceny, the accused was convicted by general court-martial of wrongful appropriation of an automobile, a violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. In addition, he was convicted of absence without leave for three days, in violation of Article 83, Uniform Code of Military Justice, 50 USC § 677, and escape from lawful custody, in violation of Article 95, Uniform Code of Military Justice, 50 USC § 689. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The convening authority approved, and a board of review affirmed the findings and sentence.

The question before us is whether the law officer committed prejudicial error by his refusal to limit trial counsel's cross-examination of the accused to the offense of larceny.

Around 10:00 p.m. on August 9 the accused, Kelly, was apprehended by the military police while driving an automobile without military tags on the post at Fort Knox, Kentucky. It turned out that the vehicle belonged to Mr. Phelps, a resident of Louisville, Kentucky. He had not given anyone permission to drive his car from the position where he had left it parked on a street in Louisville. After the accused was apprehended, he was taken to the Post Central Military Police Station. The desk sergeant made a telephone call to secure information about the car. During his conversation, he mentioned the word "stolen," at which time the accused ran out of the police station. After spending three days in Louisville, Kelly returned to Fort Knox and surrendered himself to the military authorities.

While testifying on the larceny charge, the accused recalled how the first sergeant had impressed upon him the desirability of being on time for work. On the evening of August 8th, he found himself in Louisville without return transportation to Fort Knox. He took the automobile to guarantee that the admonitions of the first sergeant would not go unheeded. During the interrogation, the defense counsel asked the following question:

"Q: Now, on August 9 around 2200

or around 11 o'clock . . . ten o'clock, did you go back to Louisville? The day after?

"A: Yes, I did."

Following this testimony the accused gave a detailed explanation of the three days' absence in Louisville. After he returned to Louisville, he wrote his first sergeant and made several abortive attempts to locate the owner of the automobile.

At the conclusion of this testimony the law officer, over defense objection, permitted the trial counsel to question the accused with respect to the escape from custody. The accused had taken the stand for the limited purpose of testifying to the larceny charge and he claimed privilege against examination on the charge of escape. Government counsel brought out the fact that the accused ran from the police station after he heard the desk sergeant mention over the telephone the word "stolen."

"Q: Didn't you state that you heard the desk sergeant repeat the words 'stolen vehicle?'

"A: After that I knew I was in trouble.

"Q: And that's why you ran?

"A: No. That's not why I ran.

"Q: Would you please explain to the members of the court just why you did run?

"A: Well, I ran out of the Central Military Police Station for the purpose of getting to that car and returning it to Louisville, Kentucky where I had found it, explain to the man why I had taken it and to return to my company."

On redirect examination, counsel for the accused elicited specific information regarding the escape charge. His first question on redirect was, "What did you do when you ran out of the Central Military Police Station? Where did you go?" In answer to this, and additional questions by a member of the court, the accused proceeded to explain the details of his escape from the police. According to his account of the incident, he was picked up by the military police at the very time he was attempting to leave the post in order

**220**

to return the car to its rightful owner. His purpose in returning to Louisville, after his escape from custody, was to explain the situation to the owner of the automobile in hopes that the complaint against him would be less severe. He returned to his post three days later because he did not want to be absent without leave for more than seventy-two hours.

The accused's first sergeant was recalled by the defense and testified that Kelly had written him about why "he ran away from the MP's," and he was going to "remain AWOL until he heard from me."

While making his closing argument, the defense counsel invited the court's attention to the accused's "admission . . . as to . . . why he left the military police station on 9 August."

At the outset, it might be well to distinguish between cross-examination which violates the privilege against self-incrimination, and cross-examination which exceeds the scope of direct examination. According to Wigmore, the two types of cross-examination are separate and distinct, although they do merge in some instances. The latter limitation was originally prescribed to facilitate the order of presenting evidence because in most jurisdictions one is not permitted to put in his case by cross-examination of an opponent's witnesses.

". . . in the usual phrase, the *cross-examination must be confined,* in its material, to the *subject of the direct examination.* This rule, in its effect upon the examination of the accused, is palpably unfair to the prosecution; for, since the prosecution would presumably have neither the right nor the desire to recall the accused as its own witness, that which was intended merely as a prohibition against obtaining certain facts on his cross-examination becomes in effect a prohibition against obtaining them from him at all.

"It is here, however, worth while to note that this rule, as enshrined in many States by statute, is by some Courts interpreted as if it were a rule affecting the *waiver of the privilege*

against self-crimination. The two have of course no connection; although, if the former rule forbids questions which go beyond the subject of the direct examination, the waiver is also incidentally thus limited, for the simple reason that there are no questions for the accused to answer, and the result is the same. But the practical error of treating the two questions as one (an error not uncommon under such statutes) is seen in the case of questions directed merely to facts impeaching character. Here it is plain that the effect of the first rule is not to exclude such inquiries . . . ; for there would otherwise never be any opportunity to ask them. But this leaves the question of privilege and its waiver still undetermined, and resort must be had for that purpose to the appropriate principle . . . . In a few jurisdictions, however, this distinction seems irrevocably buried in the decisions interpreting the statute." [Wigmore, Evidence, 3d ed, § 2278.]

The Manual rule with respect to the latitude of cross-examination is stated in paragraph 149*b*(1), Manual for Courts-Martial, United States, 1951, page 280.

"An accused person who voluntarily testifies as a witness becomes subject to cross-examination upon the issues concerning which he has testified and upon the question of his credibility. So far as the latitude of the cross-examination is discretionary with the court, a greater latitude may be allowed in his cross-examination than in that of other witnesses. When the accused voluntarily testifies about an offense for which he is being tried, as when he voluntarily testifies in denial or explanation of such an offense, he thereby, with respect to cross-examination concerning that offense, waives the privilege against self-incrimination, and any matter relevant to the issue of his guilt or innocence of such offense is properly the subject of cross-examination."

And the cross-examination of an ac-

cused which requires him to limit, explain, or modify his direct testimony is proper.

"The defendant may be cross-examined as to any matter touched upon in his direct examination. He may be asked questions the answers to which would tend to limit, explain, or modify his testimony in chief, or supply the details of occurrences related by him on his examination in chief; and if he attempts to relate an occurrence, any details and features admitted by him may be brought out on cross-examination.

". . . The cross-examination of the accused is not, however, to be limited to a mere categorical review of the matter testified to in the direct examination, but may extend to any matter referred to, or within the fair purview of, such examination." [Wharton, Criminal Evidence, 12th ed, § 889.]

In view of the accused's testimony on direct, it does not appear that the law officer abused his discretion with regard to the scope of the trial counsel's cross-examination. The difficulty which confronted the accused was that in order to explain his intent as to the larceny charge, he was forced of necessity into the area of the escape offense. According to his testimony, he escaped from custody and remained in an absentee status for three days in order to find the owner of the automobile. Counsel for the accused undoubtedly realized that when his client took the stand, he could not but help trespassing in this area. However, this is the risk which the accused knowingly incurred when he took the stand. For us to hold the prosecution could not probe into this area of the accused's behavior would mean a practical abolition of the Government's right of cross-examination with respect to the larceny charge.

In addition to the scope of the examination discussed above, we must direct our attention to the ac-■■■■■ cused's assertion that his privilege against self-incrimination was violated by questions on cross-examination relating to the

**221**

offense of escape from custody. Paragraph 149*b* (1), Manual for Courts-Martial, supra, restricts the cross-examination of an accused to the offense or offenses about which he has testified. Differently stated, the accused cannot be cross-examined "with respect to the offense or offenses about which he has not testified." An examination of this language compels the conclusion that a condition precedent to the privilege's protection is that the accused succeed in restricting his testimony; otherwise the privilege is waived. This conclusion is borne out by numerous decisions and authorities. In Fitzpatrick v United States, 178 US 304, at page 315, 20 S Ct 944, 44 L ed 1078, the Supreme Court declared:

> "Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."

Of course, the accused does not have to take the stand and if he does not, no adverse inferences will be drawn; however if he elects to take the stand, he must take the bitter with the sweet. If he opens up a relevant subject matter, he may be cross-examined thereon. In Johnson v United States, 318 US 189, 63 S Ct 549, 87 L ed 704, the court stated:

> "The case of an accused who voluntarily takes the stand and the case of an accused who refrains from testifying (Bruno v United States, 308 US 287, 84 L ed 257, 60 S Ct 198) are of course vastly different. Raffel v United States, 271 US 494, 70 L ed 1054, 46 S Ct 566. His 'voluntary offer of testimony upon any fact is a waiver as to *all other relevant facts*,

because of the necessary connection between all.' 8 Wigmore, Evidence, 3d ed. 1940, § 2276 (2). And see Fitzpatrick v United States, 178 US 304, 315, 316, 44 L ed 1078, 1083, 1084, 20 S Ct 944; Powers v United States, 223 US 303, 314, 56 L ed 448, 452, 32 S Ct 281."

That portion of Wigmore quoted in the above Johnson case makes this emphatic pronouncement with respect to an accused in a criminal case who decides to risk the stand:

> "The case of an *accused* in a criminal trial, who *voluntarily* takes the stand, is different. Here his privilege has protected him from being asked even a single question, for the reason that no relevant fact could be inquired about that would not tend to criminate him . . . On this very hypothesis, then, his voluntary offer of testimony upon any fact is a waiver as to *all other relevant facts*, because of the necessary connection between all. His situation is distinct from that of the ordinary witness, with reference to the point of time when a waiver can be predicated, because the ordinary witness is compelled to take the stand in the first instance, and his opportunity for choice does not come till later, when some part of the criminating fact is asked for; while the accused has the choice at the outset.

> • • • • •

> "The result is, then, that the accused, as to all facts whatever (except those which merely impeach his credit and therefore are not related to the charge in issue), has signified his waiver by the initial act of taking the stand. Moreover, the spirit and the purpose of the privilege . . . cannot be violated by any questioning after the accused has once voluntarily taken the stand; and the nice distinctions attempted by Courts are needless." [Wigmore, Evidence, 3d ed, § 2276 (2).]

The fact that the testimony, elicited on cross-examination, might evince another offense does not compel its exclusion. The court in Cook v United States, 28 F2d 730 (CA 8th Cir)

(1928), took notice of a situation wherein the offenses were so interwoven that the prosecution of one necessarily involved the prosecution of the other:

". . . As a general rule, evidence of other crimes is inadmissible, but to this rule there are certain well-recognized exceptions. It does not apply where the evidence of another crime tends directly to prove the crime charged, and evidence which is relevant to defendant's guilt is not rendered inadmissible because it proves or tends to prove him guilty of another separate and distinct crime. It often happens that two distinct offenses are so inseparably connected as in the instant case that the proof of one necessarily involves proof of the other, and in such case on the prosecution for one, evidence proving it should not be excluded because it also proves the other."

We recognize the vulnerability of the accused who takes the stand to testify for a limited purpose in United States v Hatchett, 2 USCMA 482, 9 CMR 112:

". . . Even though an accused testified for a limited purpose this does not preclude the cross-examiner from probing into fields which may weaken or destroy his evidence. It may be that in certain instances the answers might indirectly tend to connect the accused with the crime or to identify him as being a possible perpetrator of an offense, but if they are relevant to test his credibility, the questions are proper and must be answered."

With the above authorities in mind when we examine the testimony of the accused, we have no hesitancy in holding that the accused waived his privilege against self-incrimination. His testimony that he escaped from the police in order to return to Louisville to find the owner of the car went directly to his intent to steal the automobile. The defense specifically explained that the reason the accused returned to Louisville around 10:00 p.m. on August 9th, two hours after his escape from custody, was to locate the owner of the car and explain to that individual that the accused had no intent to permanently keep the car. Although rejected by the court, trial counsel by his cross-examination was apparently attempting to point out that the reason the accused left the police station as he did was not because he wanted to find the owner of the car, but rather for the reason that he did not want to be charged with larceny. In view of the accused's testimony on direct, it would appear that the trial counsel's questions were relevant as to the former's intent to steal. For us to hold that trial counsel was prohibited from exploring this area would, for all intents and purposes, negate or make futile his cross-examination of the accused.

Even if we were to assume arguendo that the accused did not waive his privilege on direct examination, the record makes more than abundantly clear that afterward, during the trial, the accused waived any such claim of error. On redirect examination, the accused immediately went back into the matter which he now claims was covered by his privilege, and, without objection, permitted a member of the court to cover with particularity the offense of escape from custody as well as the unauthorized absence. Moreover, the accused on direct examination, testified that after he left camp on August 9, he wrote his sergeant a letter. Later the defense called the sergeant as a witness and the latter testified as to the contents of the letter which stated that the accused had escaped from the police. This, as well as other actions by the accused, cured any error which might have arisen as a result of the trial counsel's initial examination. As the Court observed in Hatchett, supra:

". . . if any error arose by the law officer exceeding the fair bounds of cross-examination it was cured by the subsequent testimony of the accused. His evidence not only established his guilt of the offense but also it paraded before the court-martial facts and circumstances he complains were brought to its attention by the law officer . . . . Considering the theory of defense, if any, and the procedure adopted, the question narrows to whether the testi-

**223**

mony was obtained prematurely and if so, can the timing be the basis of prejudice? Assuming that when produced it might be, because not relevant at that time, it would be ridiculous to reverse a case because evidence was placed in the record by the Government prior to the time the accused voluntarily and judicially confessed to the same state of facts. That is not of controlling importance as the right not to be required to incriminate oneself is a privilege which must be claimed or it is waived. Valuable as it may be, its violation can be cured by the voluntary act of the person injured."

Finally defense counsel evidently felt that the accused had abandoned any right he might have had against self-incrimination for he invited the court's attention to the fact that the accused had admitted the escape. This was doubtlessly done to show that the accused had made a full disclosure of the whole matter and was not attempting to hide any facts from the court. Obviously this argument was intended to be beneficial to the accused, and it is indicative of the accused's approach throughout the trial. A more conscious waiver on the part of the defense could hardly be imagined. The accused should not now on appeal be heard to complain that the actions in which he actively participated were prejudicial. United States v Smith, 2 USCMA 440, 9 CMR 70.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

Judge LATIMER concurs in the result.