UNITED STATES, Appellee

v

DELMAR L. PRUITT, Specialist Four, U. S. Army, Appellant

12 USCMA 322, 30 CMR 322

No. 14,548

Decided April 28, 1961

First Lieutenant Burnett H. Radosh argued the cause for Appellant, Accused. With him on the brief was Lieutenant Colonel W. H. Blackmarr.

**323**

■■■■■■■■■■

*First Lieutenant Alvin B. Fox* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. Mc-Conaughy* and *Captain William A. Zeigler*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused challenges the validity of his conviction of four charges, in violation of the Uniform Code of Military Justice.[1] We shall consider the assignments of error in the order presented by appellate defense counsel.

First, it is contended that the evidence is insufficient to support the offense of larceny set out in specification 2, Charge II.[2] The specification alleges that the accused stole $60.00 from Weaver's Pawn Shop. Mr. Ted Atkins, the owner of the shop, testified for the prosecution. He said he had owned the shop since February 1960.[3] One day, which he placed in August 1959, he went out to lunch leaving Mr. Weaver, the former owner, in the store. On his return he found a $60.00 check in the cash register. The check was drawn to Weaver's Pawn Shop; it was dated September 11, 1959; and was signed "Bill Pruitt." At the end of the day Mr. Atkins went through the cash register. There was a shortage of $60.00 which was "the amount of the check." However, Mr. Atkins testified he did not remember whether the $60.00 check was the only check in the cash register that day, and he did not know whether the day's tally of cash was short or over, although there were days when "we've come up over, and we've come up short." Mr. Atkins kept the check in his petty cash until "the first time . . . [he] had a chance to take it to the bank." The bank refused payment. An ex-

amination of the bank records by a bank official indicated no account in the name of Bill or Delmar Pruitt. Mr. Atkins further testified he did not know what was given for the check, if anything; and he had "absolutely no knowledge" of what transpired between the accused and Mr. Weaver. After payment on the check had been refused by the bank, he attempted to communicate with the accused, who had worked next door at a business establishment run by Mrs. Weaver, but his efforts were unsuccessful. Finally, another witness testified that she had seen the accused write his signature on checks and other documents, and she was "sure" the signature on the Weaver check was the accused's. Mr. Weaver was not called as a witness. Apparently he was in a prison for violation of the liquor laws.

Guilt beyond a reasonable doubt may be established by circumstantial evidence as well as by direct ■■■■■■ ■ evidence of the commission ■■■■■■ ■ of the offense. United States v Wilson, 8 USCMA 329, 24 CMR 139. The board of review below held, and the Government contends here, that the "only reasonable inference" from the evidence is that the accused cashed the check. Appellate defense counsel maintain there are other reasonable alternatives which are wholly consistent with innocence. They maintain that considering the nature of the business conducted by Atkins, it was entirely possible the check was

---

[1] Charge I (False official statement, in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907); Charge II (Larceny of $60.00, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921); Charge III (False claim against the Government, in violation of Article 132, Uniform Code of Military Justice, 10 USC § 932); Charge IV (Unlawful cohabitation, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934).

[2] The accused was acquitted of specification 1.

[3] At another point in his testimony, the witness said he "had leased the property and the building *with* . . . [Mr. Weaver], and the understanding was that he [Mr. Weaver] would stay and help . . . until . . . [the witness] had learned something about the business." Later, Mr. Weaver took "his business back over again."

given in payment of a pre-existing loan. Whether this is a reasonable alternative is of little consequence. More important, in our opinion, is the fact that the evidence is equally consistent with the idea that the accused gave Weaver a post-dated check on the understanding he would deposit the necessary funds to cover the amount before the due date. Thus, Atkins testified he found the check in his register in August, but the check itself is dated September 11. The accused worked next door for Mrs. Weaver, and there is evidence indicating he knew Mr. Weaver. Finally, Mr. Weaver had a substantial connection with the operation and management of the business and it would not be unreasonable for him to enter into such an arrangement with the accused. If this were the actual situation, the accused was not guilty of larceny, although he had no account in the drawee bank at the time. United States v Cummins, 9 USCMA 669, 26 CMR 449. Since an innocent explanation of the check is found in the evidence, guilt beyond a reasonable doubt is not established. United States v Lyons, 11 USCMA 68, 28 CMR 292; United States v Brown, 3 USCMA 242, 11 CMR 242.

In the second assignment of error, appellate defense counsel contend that the law officer erroneously prevented the accused from presenting evidence to support the defense of entrapment as to Charge I. The specification of that charge alleges that on September 15, 1959, with intent to deceive, the accused signed an official record known as emergency data form, knowing the record falsely represented that his wife resided in Lawton, Oklahoma. The evidence relating to the charge is as follows: The accused married Edith Hall in North Carolina in December 1955 and they had a child in December 1956. The marriage was never terminated. At all times important to the charge Mrs. Hall and the child lived in Virginia. In January 1959 while stationed at Fort Sill, Oklahoma, the accused met Lonetia Jones. According to Miss Jones, she and the accused were married in Wichita Falls, Texas, in June 1959, by a justice of the peace, but she could not thereafter locate that official and had no formal record of the marriage. From the date of the marriage ceremony to September 1959, she and the accused lived together, and publicly held themselves out as husband and wife.

On September 14, 1959, the accused had a discussion with his company commander, Captain Bruner, which led to the accused's completion of the emergency data record falsely representing that Edith Hall Pruitt and the accused's daughter resided in Lawton, Oklahoma. Testifying by deposition, Captain Bruner said he received a phone call from the post chaplain's office, advising him that the accused was "living with someone not his wife," and requesting that he determine the "present status" of the accused's emergency data card. Data cards had to be kept current, and it was one of the responsibilities of the commanding officer to see they were correct. Captain Bruner knew the accused's card did not show his wife to be living in Lawton. Accordingly, he called in the accused to "determine the accuracy of this particular form." He asked the accused specifically if his wife and daughter were in Lawton, and he received an affirmative reply. At that time he had no reason to suspect the accused of committing any offense. He also inquired as to the date of the accused's marriage and was informed that it occurred in 1957. He told the accused the emergency data card showed the wife and child to be residing in Virginia and "he should have this corrected."

Captain Bruner admitted his statement to the accused could be "interpreted as an order," because a conversation between an officer and enlisted man "is normally interpreted that way." The accused did not indicate whether he intended to comply with the order, but the Captain "assumed" he would because the card had to be corrected. After the accused left his office, Captain Bruner decided to call the Criminal Investigations Detachment to check into the "entire background"; to inquire "into the realness [of the marriage]"; and to investigate the possibility of illegal allotment, because the information was "improper on his data card," and he felt "something was certainly not

**325**

proper." The accused proceeded to the personnel office at group headquarters. There he signed a new emergency data form in which he represented, as noted above, that his wife and child resided in Lawton.

At trial, the accused took the stand to testify only in connection with Charge I. He further admitted, in response to Captain Bruner's question whether he was living with a woman not his wife, that he said he was living with his wife in Lawton. He also admitted he provided the false information to the personnel record clerk, and that he signed the record knowing at the time his wife and child resided in Virginia. His excuse for lying to Captain Bruner was that he "didn't think it was any of . . . [the Captain's] business"; and his reason for signing the record notwithstanding his knowledge of the falsity of the information was that he was "told to by the Company Commander."

The personnel records clerk also testified for the defense. He confirmed the changes in the record made by the accused. He did not recall receiving any previous word that the accused would call to change the record, but "that afternoon or the next day," he received a call from Captain Bruner "to pull the 93." His testimony about that conversation provides the basis for the defense claim of error.

"Q. And did he tell you what the purpose was that you should bring it over?

"A. He said something about a court-martial, sir.

"TC: His answer calls for a conclusion. Of course, we object.

"DC: The defense's theory is entrapment. What the defense is trying to show, of course, is that this document was simply used, and the necessary form, for Pruitt to go over there to make out the document, was simply a plan on the part of Captain Bruner to get this boy for one more offense, and we're not showing the truth of the matter as to what Captain Bruner was going to use it for, but what his attitude at that time was as regard to the filling out of this document, and I'm not introducing it as the truth of it, but just that it was said.

• • • • •

"TC: Well, sir, the Government fails to see the relevancy as compared with the objectionable basis of the material for this reason, that the defense has failed to show, one, that this man was talking to Captain Bruner. This was relative to some reported telephone conversation. . . .

"LO: I think the objection will be sustained at this time. Now, if you want to redirect your questioning to this witness, you may do so; and, gentlemen, you will disregard the testimony of this witness as to who called him and what was said in that conversation by telephone.

• • • • •

[At this point the witness established his familiarity with Captain Bruner's voice and that he knew the Captain was the other party to the telephone conversation.]

"Q. PFC Engled, after Pruitt left your office and you filled out the DD Form 93 with the information Pruitt supplied to you, what was the next thing that happened relative to that DD Form 93?

"A. Well, I got a telephone call from Captain Bruner to pull the DD Form 93.

"Q. And did he tell you what he wanted that for?

"TC: Objection.

"LO: Well, he can answer, yes, or no.

"Q. Did Captain Bruner tell you what he wanted Pruitt's DD Form 93 for?

"A. As evidence.

"TC: Objection, Your Honor. He's starting to relate, rather than what he told you—yes, or no.

"LO: Just answer the question, what he wanted it for. Answer yes, or no.

"WITNESS: Yes.

"Q. What did Captain Bruner tell you?

"TC: Objection.

"LO: Objection sustained.

"Q. You then took the Form DD 93 to Captain Bruner, is that right?

"A. Yes, sir.

"DC: I have no further questions."

The Government and the accused disagree on whether the excluded evidence has probative value in regard to the accused's defense of entrapment. In our opinion, it is unnecessary to consider the relevancy or materiality of the testimony. Entrapment stands as a bar to conviction for an offense, only if the idea for the commission of the offense does not originate with the wrongdoer. See United States v McGlenn, 8 USCMA 286, 24 CMR 96. Here, the accused admitted he lied to Captain Bruner about his wife's place of residence, not because he was beguiled or induced to do so by a public official, but because he did not think it was "any of . . . [Captain Bruner's] business." Thus, the willingness and the design to falsify originated with and was then known only to the accused. He alone advanced the false information without solicitation and without inducement. As for Captain Bruner's order, it was not to put false information in the emergency data record but to *correct* the old record to accord with the current facts which the accused had to him represented to be true. Consequently, the order was not to perform an illegal act, but to carry out a legal obligation. The evidence compellingly shows that the accused was not enticed, induced, or compelled to lie and to falsify the emergency record data. Accordingly, we find no merit in the claim of prejudice in the exclusion of Engled's testimony of his conversation with Captain Bruner.

Next, the accused contends that prejudicial error was committed in the admission of certain deposition testimony. The witness, a Criminal Investigations Detachment Agent, obtained a pretrial confession from the accused. In his deposition he identified as the accused's confession a document attached as an exhibit. At trial, defense counsel objected to the admission of the deposition and its exhibit on the ground that before the deposition was taken the Government had forwarded to the witness documents to refresh his recollection of the case. Counsel maintained that the defense was entitled to be informed of the documents and to use them in cross-examination of the witness. The Government conceded it had sent a copy of the Criminal Investigations Detachment file to the witness. The file contained a report made by the witness, one of the agents who worked on the case, and statements upon which the report was based. The law officer ruled that in the absence of a showing that the witness used the documents "while he was testifying," defense counsel had no right to see the documents for purposes of cross-examination. In the context of the defense claim of error, the ruling was correct.

A witness can refer to any document or memorandum that he desires before he takes the witness stand. If he testifies without the aid of any writing, there is no basis for contending the previous refreshment of the witness' recollection curtailed the defendant's right to cross-examine him. Counsel, of course, can ask any witness if he has refreshed his recollection of the case before taking the stand. If the witness replies in the affirmative, inquiry may be made into the means of refreshment; and if it appears the witness made an earlier statement about, or report on, the matter counsel may obtain the statement or report for possible impeachment. See United States v Heinel, 9 USCMA 259, 26 CMR 39; United States v Bergen, 6 USCMA 601, 20 CMR 317. Here, there was nothing to show use of the file while testifying, and there was no inquiry into the question of refreshment of his recollection.

Finally, in a series of assignments of error appellate defense counsel contend that no consideration should be given to certain admissions made by the accused in his sworn testimony, and that under our decision in

**327**

United States v Jacoby, 11 USCMA 428, 29 CMR 244, two depositions on written interrogatories were erroneously admitted into evidence. The arguments lack merit. First, the record of trial shows no circumstances from which it can reasonably be inferred that the accused was forced to testify to avoid the effect of incompetent evidence. Cf. United States v Sessions, 10 USCMA 383, 27 CMR 457. On the contrary, it very clearly appears that the accused testified and presented other evidence to support his claim of entrapment. Secondly, defense counsel specifically stated he had no objection to "the method in which" one of the two depositions was taken, and that his only objection to the second deposition was the Government's failure to inform him that the Criminal Investigations Detachment file had been forwarded to the agent-witness.

For the reasons set out above, we set aside the findings of guilty of Charge II and the sentence. The record of trial is returned to The Judge Advocate General of the Army for submission to a board of review for reassessment of the sentence on the basis of the remaining findings of guilty.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I dissent from that portion of the Chief Judge's opinion concurred in by Judge Ferguson which holds the evidence is insufficient to establish the crime of larceny. However, no law which could be applied in subsequent cases is established by the holding and, therefore, on this facet of the controversy I just note my disagreement.

The other issue which divides the Court is the Government's use of the deposition of the witness who obtained a pretrial statement from the accused. Judge Ferguson quotes the colloquy between the law officer and defense counsel and, if the latter had interposed an objection based on lack of confrontation, Judge Ferguson's interpretation would be correct. But the other statements by defense counsel, both before and after the isolated comment that

prosecution exhibit 18 was a written, not oral, deposition, place the contention of inadmissibility in its true perspective. Defense counsel opened up his out-of-court discussion by asserting that within a five-day period preceding trial he had learned that certain memoranda had been forwarded to the witness to be used by him to refresh his memory of the events he recorded. He next complained about the fact that defense had not been alerted so that the writings could be used for cross-examination. He was reminded by the law officer that, under the defense interpretation of the law, before any objection could be well taken it was necessary to establish that the witness was using the documents as a base for his answers. In reply, counsel mentioned several reasons why he was unable to make that showing and particularly because he was not present when the testimony was taken and the deposition did not disclose whether the witness had made use of the documents. When the law officer suggested that some of the contingencies mentioned by defense counsel should be eliminated from consideration and they should get to the meat of the argument about admissibility, defense counsel responded, in essence, that he should be permitted to see all documents forwarded with a written deposition. From the fair import of his language, it is apparent to me, and it must have impressed the participants at the trial in the same manner, that defense counsel's reference to not being present was to justify his claim that he should have been furnished copies to be used to prepare cross-interrogatories. Assuming *arguendo* he was right in that contention, the claim has nothing to do with the right of confrontation. As I understand United States v Jacoby, 11 USCMA 428, 29 CMR 244, the holding was predicated on the absence of the accused, and in the case at bar not once did counsel mention that deficiency. His hypothesis is made crystal clear when he summed up his objection by stating:

"... but I just think prosecution oversteps his rights when he sends documents to the man with the notice that the deposition is to

be taken, and that he can use these documents to refresh his memory for the deposition. That's my objection, sir, I have nothing further."

One additional matter not mentioned in either opinion is that the accused judicially confessed to all the essential facts included in the pretrial statement. In reply to Judge Ferguson's assertion that part of accused's answers were in response to improper cross-examination by trial counsel, I merely state, first, that the testimony on the false statement and false claim was given by him on direct examination. Second, the cross-examination was in the area opened up by the defense on direct, and the accused testified without any objection that he falsified his official records as he was living at the address shown thereon with a woman not his wife whom he identified by name. Therefore, assuming for the sake of argument only that the defense objection to the deposition was well taken, the testimony allowed in evidence as a result of the law officer's ruling was not prejudicial.

I would affirm the decision of the board of review.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with the Chief Judge that the evidence is insufficient in law to sustain the findings of guilty of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, and that the defense was not improperly restricted in its examination of a witness with respect to the defense of entrapment. However, I am unable to join in the conclusion that prejudicial error was not committed in the receipt of a deposition upon written interrogatories executed by the criminal investigator who secured accused's pretrial confession.

With respect to the receipt of the deposition, the record discloses that the accused objected to its admission in evidence on a twofold basis. Thus, his counsel stated:

"DC: Sir, in the taking of this deposition, which is Prosecution Exhibit 18 for identification, of Specialist Five Norman K. Holloway, the defense has become aware, in the last few days, that prior to the taking of this deposition, prosecution sent to Specialist Holloway certain documents in which I think was a letter of, something to the effect: we send you these documents to refresh your memory. Now, of course, the defense concedes that when a witness gets on the stand, even here in court, if the witness looks at documents or papers, or anything, before coming into court, and doesn't bring them into court and refresh their memory, why the defense probably does not have any right to see those documents, but if the witness takes the stand and, from documents in their possession, does refresh the witness' memory, it is the defense's belief that the defense has a perfect right to request the use of these documents in order to cross-examine the witness.

"Now, in this case, the witness was sent certain documents outside of the deposition, and to which were not attached to the deposition, and whether or not this witness used these documents in testifying, what he used the documents for, I have no way of knowing, but it's my contention that when prosecution sends out a deposition, if it sends documents to the witness, it should inform the defense counsel of these documents so that the defense has an opportunity to use the documents for purposes of cross-examination.

"LO: I believe counsel stated, before he made his last remark, that if a witness consults or uses documents to refresh his memory before getting on the stand, then counsel for the defense does not have a right in such a situation to examine the documents, and it is only in those cases where a witness uses the documents to refresh his memory while on the stand that counsel for the defense may have a right to examine those documents. Now you tell me that you do not know whether this witness used these documents to refresh his memory, or whether he used them when he testi-

fied. I am of the opinion that before you can successfully attack the deposition upon that point, and upon the theory which you are now presenting, you must show that the witness did not use the documents to refresh his memory while he was testifying, under your own theory of your argument here. I am asking you, is that not true?

"DC: That is true, except my feeling is this, that these depositions, as used in a General Court-Martial, are necessary because the people are very often scattered all over the world; this man is in Germany. I don't know how the deposition was taken, when it was taken. It may have been taken by one man and the reporter who went down to the man's unit and had him called up to the office and took the deposition, but there would be nothing in the deposition itself requiring the office taking the deposition to show whether the witness had anything in his hand or not.

"LO: Well, I can see that, but let's forget all of these contingencies that might happen. I want to hear argument on the basis of why you object to Prosecution Exhibit 18 for identification being admitted in evidence as Prosecution Exhibit 18.

"DC: *I object to Prosecution Exhibit 18 for identification because it was a written deposition, not an oral deposition, and defense counsel was not there,* and it just seems to me that there are limitations by which the prosecution can use these depositions, and if the prosecution is going to send documents, and the allied papers and everything along with depositions, then the defense ought to be given the right to see these documents before he sends them. Now, this time they didn't attach them to the deposition and I had no way of knowing what was being sent.

"LO: Were you given an opportunity to present, or to to offer cross-interrogatories, or to make cross-interrogatories of this witness prior to the deposition being sent out?

"DC: I was given the opportunity.

"LO: Did you make those cross-interrogatories?

"DC: Yes, sir.

"LO: All right, go ahead, then.

"DC: Well, I have nothing further, except the belief that the prosecution, in order to use these depositions in a court-martial, cannot attach such documents, and the defense is satisfied with one thing, it is going to require in all cases oral deposition, and all of these people all over the world are going to be traveling all over the place, just to make sure that they are taken correctly, and I feel that in most cases it may be unnecessary, but I just think prosecution oversteps his rights when he sends documents to the man with the notice that the deposition is to be taken, and that he can use these documents to refresh his memory for the deposition. *That's my objection, sir, I have nothing further.*" [Emphasis supplied.]

In United States v Jacoby, 11 USCMA 428, 29 CMR 244, this Court ruled that depositions taken upon written interrogatories may not be used in evidence by the Government over objection by the defense. In that opinion, we stated, at page 433:

". . . The correct and constitutional construction of the Article in question [Article 49] requires that the accused be afforded the opportunity (although he may choose knowingly to waive it thereafter) to be present with his counsel at the taking of written depositions. We so hold."

I agree with the Chief Judge that one part of the accused's objection went solely to the question whether it was prejudicial for the trial counsel unilaterally to forward a copy of the criminal investigation report to the prospective deponent in order to refresh his memory and that this claim of error must be overruled. It is, however, equally apparent that accused also objected to the receipt of the deposition on the basis that it was taken upon written interrogatories without the presence of the defense counsel. When

that objection is made, the doctrine which we enunciated in United States v Jacoby, supra, must inevitably come into play and require a holding that the deposition's use was erroneous.

Turning to the rationale of the principal opinion, it is clear that I disagree with the Chief Judge's statement that accused's "only objection to the second deposition was the Government's failure to inform him that the Criminal Investigations Detachment file had been forwarded to the agent-witness." In light of the preciseness with which defense counsel identified his grounds as including the fact that the prosecution exhibit was a "written deposition" and that it was taken when "defense counsel was not there," it seems absurd to hold that he was not invoking the denial of confrontation as a barrier to receiving the item in evidence. I am unable so to conclude, and I cannot agree there is even room for argument on this issue.

The sole remaining question is whether the utilization of the deposition prejudiced the rights of the accused. Again, I believe it must be held that prejudice is apparent. The deposition was utilized as the predicate for the introduction of accused's confession, which was an exhibit attached thereto. Without the interrogatories, there was no basis for its admission into evidence, and, as we have heretofore noted, such a statement "is among the most effective proofs in the law." United States v Monge, 1 USCMA 95, 97, 2 CMR 1. While accused elected to testify in his own behalf, he expressly limited his testimony to the charge of making a false official statement. As the majority note, he judicially confessed to that offense. Thus, his "informed action in this respect served to overcome any violation" concerning that charge. United States v Woodruff, 11 USCMA 268, 270, 29 CMR 84; United States v Kelly, 7 USCMA 218, 22 CMR 8. However, that consideration does not apply with respect to the offenses of wrongful cohabitation and making a false claim for separate rations. Thus, reversal of the findings of guilty with respect to these is required.

With respect to the contention in the concurring and dissenting opinion that accused's objection was not based upon the principle we set forth in United States v Jacoby, supra, I merely invite attention to the language quoted from the record, supra, as clearly indicative of defense counsel's intent. Moreover, I suggest that limitation of the grounds to the position taken by my brother Latimer too narrowly delimits the scope of counsel's grounds.

The purpose of an objection by counsel with respect to a matter of proof is reasonably to bring to the law officer's attention the basis for the admission or exclusion of evidence. United States v Brown, 10 USCMA 482, 28 CMR 48. His language ought, therefore, to be afforded a reasonable interpretation and, perhaps, a somewhat broader scope in the case of appointed military counsel. Here, it must be remembered we deal with relatively young and inexperienced officers rather than sophisticated members of the bar whose long years of service enable them to state their ground for objection with the utmost precision. Regardless, however, of whether this circumstance is considered, it is clear that counsel here sought also to object on the basis of denial of confrontation, and the contrary interpretation simply takes too limited a view of his effort to make this apparent to the law officer.

Although not reached in the principal opinion, the reason why the erroneous use of the deposition is not cured by accused's "judicial confession" to the offenses of wrongful cohabitation and making a false claim is simply that the admissions with respect to these offenses were extorted from him on cross-examination by the trial counsel over proper objection that the accused had expressly and otherwise limited his testimony to the charge of making a false official statement. United States v Marymont, 11 USCMA 745, 29 CMR 561; United States v Johnson, 11 USCMA 113, 28 CMR 337; United States v Kelly, 7 USCMA 218, 22 CMR 8. As the Chief Judge disposes of the deposition issue on other grounds, he does not reach this question, nor does it form a part of our grant of review.

**331**

As I believe the deposition was inadmissible in view of the objection, I also find no need to go beyond our grant, except to note, as I have done, that a judicial statement thus obtained cannot serve to cure a previously committed error.

In sum, then, I believe the accused appropriately preserved his right to complain in this Court of the receipt of the deposition taken upon written interrogatories. In view of our conclusion in United States v Jacoby, supra, that such could not be received in evidence in the absence of a waiver from the accused, it is obvious that the law officer erred in overruling the defense objection to its introduction. That error is prejudicial under the circumstances. Accordingly, we should set aside the findings of guilty of wrongful cohabitation and making a false claim in addition to those relating to the larceny charge and order reassessment of the sentence on the remaining charges. I would order such action.