## FITZPATRICK *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF ALASKA.

Submitted April 30, 1900. — Decided May 28, 1900.

Under the Court of Appeals Act of March 3, 1891, a conviction for murder is a "conviction of a capital crime," though the jury qualify their verdict of guilty by adding the words "without capital punishment." The test of a capital crime is not the punishment which is imposed, but that which may be imposed under the statute.

Under the statute of Oregon requiring the offence to be stated "in ordinary and concise language and in such manner as to enable a person of common understanding to know what was intended," an indictment for murder charging that the defendant feloniously, purposely, and of deliberate and premeditated malice inflicted upon the deceased a mortal wound of which he instantly died is a sufficient allegation of premeditated and deliberate malice in killing him.

Evidence that one jointly indicted with the defendant was found to have been wounded in the shoulder, and his accompanying statement that he had been shot, were held to be competent upon the trial of the defendant.

Any fact which had a bearing upon the question of defendant's guilt immediate or remote and occurring at any time before the incident was closed, was held proper for the consideration of the jury, although statements made by other defendants in his absence implicating him with the murder would not be competent.

The prisoner taking the stand in his own behalf and swearing to an alibi was held to have been properly cross-examined as to the clothing worn by him on the night of the murder, his acquaintance with the others jointly indicted with him, and other facts showing his connection with them.

Where an accused party waives his constitutional privilege of silence and takes the stand in his own behalf and makes his own statement, the prosecution has a right to cross-examine him upon such statement with

the same latitude as would be exercised in the case of an ordinary witness as to the circumstances connecting him with the alleged crime.

Evidence in rebuttal with respect to the effect of light from the flash of a revolver was held to be competent where the defence put in a calendar, apparently for the purpose of showing the time the moon rose that night.

THIS was a writ of error to review the conviction of Fitzpatrick, who was jointly indicted with Henry Brooks and William Corbett for the murder of Samuel Roberts, on March 13, 1898, at Dyea, in the Territory of Alaska.

The indictment, omitting the formal parts, was as follows:

" The said John Fitzpatrick, Henry Brooks and William Corbett at or near Dyea, within the said district of Alaska, and within the jurisdiction of this court, and under the exclusive jurisdiction of the United States, on the 13th day of March, in the year of our Lord one thousand eight hundred and ninety-eight, did unlawfully, wilfully, knowingly, feloniously, purposely, and of deliberate and premeditated malice make an, assault upon one Samuel Roberts, and that they, the said John Fitzpatrick, Henry Brooks and William Corbett, a certain revolver, then and there charged with gunpowder and leaden bullets, which said revolver they, the said John Fitzpatrick, Henry Brooks and William Corbett, in their hands then and there had and held, then and there feloniously, purposely and of deliberate and premeditated malice did discharge and shoot off to, against and upon the said Samuel Roberts; and that said John Fitzpatrick, Henry Brooks and William Corbett with one of the bullets aforesaid out of the revolver aforesaid then and there by force of the gunpowder aforesaid by the said John Fitzpatrick, Henry Brooks and William Corbett, discharged and shot off as aforesaid then and there feloniously, purposely and with deliberate and premeditated malice did strike, penetrate and wound him, the said Samuel Roberts, in and upon the right breast of him, the said Samuel Roberts, then and there with the leaden bullet aforesaid so as aforesaid discharged and shot out of the revolver aforesaid by the said John Fitzpatrick, Henry Brooks and William Corbett, in and upon the right breast of him the said Samuel Roberts one

mortal wound, of which said mortal wound he, the said Samuel
Roberts, instantly died, and so the grand jurors duly selected,
empaneled, sworn and charged as aforesaid upon their oaths do
say: That said John Fitzpatrick, Henry Brooks and William
Corbett did then and there kill and murder the said Samuel
Roberts in the manner and form aforesaid, contrary to the
form of the statutes in such cases made and provided, and
against the peace and dignity of the United States of America.

> "BURTON E. BENNETT,
>     "*U. S. District Attorney.*"

After a demurrer to the indictment, which was overruled, and
a motion for a continuance, which was denied, Brooks and Cor-
bett moved and obtained an order for separate trials. The
court thereupon proceeded to the trial of Fitzpatrick, the jury
returning a verdict of guilty "without capital punishment."
Motions for a new trial and in arrest of judgment were en-
tered, heard and overruled, and defendant sentenced to hard
labor for life in the penitentiary at San Quentin, California.
To review such judgment a writ of error was sued *in forma
pauperis.*

*Mr. A. B. Browne, Mr. Julius Kahn* and *Mr. Alexander Brit-
ton* for plaintiff in error.

*Mr. Solicitor General* for the United States.

MR. JUSTICE BROWN, after making the above statement, de-
livered the opinion of the court.

1. A suggestion is made by the government of a want of juris-
diction in this case, upon the ground that it is not of a "convic-
tion of a capital crime" within section five of the Court of Ap-
peals act of March 3, 1891, c. 517, 26 Stat. 826, as amended by
act of January 20, 1897, c. 68, 29 Stat. 492, specifying the
cases in which a writ of error may be issued directly to a District
Court. It is clear, however, that, as section 5339 of the Revised
Statutes inflicts the penalty of death for murder, the power given

the jury by the act of January 15, 1897, c. 29, 29 Stat. 487, to qualify the verdict of guilty by adding the words "without capital punishment," does not make the crime of murder anything less than a capital offence, or a conviction for murder anything less than a conviction for a capital crime, by reason of the fact that the punishment actually imposed is imprisonment for life. The test is not the punishment which *is* imposed, but that which *may be* imposed under the statute. As was observed in *In re Claasen*, 140 U. S. 200, 205, with respect to infamous crimes under the Court of Appeals act prior to its amendment: "A crime which is punishable by imprisonment in the state prison or penitentiary, as the crime of which the defendant was convicted, is an infamous crime whether the accused is or is not sentenced or put to hard labor; and that, in determining whether the crime is infamous, the question is, whether it is one for which the statute authorizes the court to award an infamous punishment, and not whether the punishment ultimately awarded is an infamous one." See also *Ex parte Wilson*, 114 U. S. 417, 426; *Logan* v. *United States*, 144 U. S. 263, 308; *The Paquete Habana*, 175 U. S. 677, 682; *Motes* v. *United States*, *post.* A conviction for murder, punishable with death, is not the less a conviction for a capital crime by reason of the fact that the jury, in a particular case, qualifies the punishment.

2. The first question raised by the plaintiff in error relates to the sufficiency of the indictment, which was for a violation of Rev. Stat., section 5339. This section, eliminating the immaterial clauses, declares that "every person who commits murder . . . within any fort . . . or in any other place or district of country under the exclusive jurisdiction of the United States . . . shall suffer death." This section does not define the crime of murder, but prescribes its punishment.

By section seven of an act providing a civil government for Alaska, approved May 17, 1884, c. 53, 23 Stat. 24, it is enacted "that the general laws of the State of Oregon now in force are hereby declared to be the law in said district, so far as the same may be applicable and not in conflict with the provisions of this act or the laws of the United States." We are, therefore, to look to the law of Oregon and the interpretation put thereon

by the highest court of that State, as they stood on the day this act was passed, for the requisites for an indictment for murder rather than to the rules of the common law.

By Hill's Annotated Laws of Oregon, section 1268, c. 8, title 1, relating to criminal procedure, an indictment must contain:

" 1. The title of the action, specifying the name of the court to which the indictment is presented, and the names of the parties;

" 2. A statement of the acts constituting the offence, in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

In *State* v. *Dougherty*, 4 Oregon, 200, 205, the Supreme Court of that State had held that " the indictment should always contain such a specification, of acts and descriptive circumstances as will, upon its face, fix and determine the identity of the offence, and enable the court, by an inspection of the record alone, to determine whether, admitting the truth of the specific acts charged, a thing has been done which is forbidden by law."

By section 1270, Hill's Laws, it is provided that " the manner of stating the act constituting the crime, as set forth in the appendix to this code, is sufficient, in all cases where the forms there given are applicable, and in other cases forms may be used as nearly similar as the nature of the case will permit;" and in an appendix to this section the following form is given for murder: " And purposely and of deliberate and premeditated malice killed C. D. by shooting him with a gun or pistol, or by administering to him poison, or," etc.

It will be noticed that section 1270 only declares that the form given in the appendix is sufficient in all cases where the forms there given are applicable, but it does not purport to be exclusive of other forms the pleader may choose to adopt. It does not declare the insufficiency of other forms, but merely the sufficiency of those contained in the appendix. We are, therefore, remitted to section 1268 to inquire whether the indictment contains "a statement of the acts constituting the offence, in ordinary and concise language, without repetition,

and in such manner as to enable a person of common understanding to know what is intended." This section was doubtless intended to modify to a certain extent the strictness of the common law indictment, and simply to require the statement of the elements of the offence in language adapted to the common understanding of the people, whether it would be regarded as sufficient by the rules of the common law or not. *People* v. *Dolan,* 9 Cal. 576; *People* v. *Ah Woo,* 28 Cal. 205; *People* v. *Rodriguez,* 10 Cal. 50. As was said by this court in *United States* v. *Cruikshank,* 92 U. S. 542, 558, "the object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had."

The indictment in this case, omitting the immaterial parts, avers that the accused "did unlawfully, wilfully, knowingly, feloniously, purposely, and of deliberate and premeditated malice, make an assault upon one Samuel Roberts," and a certain loaded revolver "then and there feloniously, purposely and of deliberate and premeditated malice did discharge and shoot off to, against and upon the said Samuel Roberts," and one of the bullets aforesaid, discharged as aforesaid, "feloniously, purposely and deliberate and premeditated malice did strike, penetrate and wound him, the said Samuel Roberts, in and upon the right breast, . . . one mortal wound, of which he, the said Samuel Roberts, instantly died;" and further, that the defendants "did then and there kill and murder the said Samuel Roberts in the manner and form aforesaid, contrary," etc.

Defendant criticises this indictment as failing to aver deliberate and premeditated malice in killing Roberts, although it is averred that the defendants did, with deliberate and premeditated malice, inflict a *mortal* wound, of which he instantly died, and that they killed and murdered him in the manner and form aforesaid. If, as alleged in the indictment, they, with deliberate and premeditated malice, shot Roberts in the breast with a

revolver, and inflicted a mortal wound, of which he instantly died, they would be presumed to contemplate and intend the natural and probable consequences of such act; and an additional averment that they, with deliberate and premeditated malice intended to kill him, was quite unnecessary to apprise the common understanding of their purpose. If they purposely inflicted a mortal wound, they must have intended to kill. No person could have a moment's hesitation as to what it was intended to aver, namely, that the defendants had been guilty of a deliberate and premeditated murder; and while a number of cases are cited which lend some support to the argument of the defendant, there was no such statute involved as section 1268 of the Oregon Code. We have no doubt the indictment furnished the accused with such a description of the charge as would enable him to avail himself of a plea of former jeopardy, and also to inform the court whether the facts were sufficient in law to support a conviction, within the ruling in the *Cruikshank case.* While we should hold an indictment to be insufficient that did not charge in definite language all the elements constituting the offence, we have no desire to be hypercritical or to require the pleader to unduly repeat as to every incident of the offence the allegation of deliberateness and premeditation. We are bound to give some effect to the provisions of section 1268 in its evident purpose to authorize a relaxation of the extreme stringency of criminal pleadings, and make that sufficient in law which satisfies the "common understanding" of men.

3. Certain exceptions to the admission of testimony render it necessary to notice the more prominent facts of the case. The murder took place at Dyea, Alaska, just outside the cabin of Roberts. Roberts conducted certain games at the Wonder Hotel or saloon, and slept in his cabin across the street, about a hundred and fifty feet from the saloon. Ross and Brennan, two of the government witnesses, were employed by Roberts in connection with the games. Ross testified that, about two o'clock in the morning, Roberts, the deceased, asked the witnesses to accompany him from the Wonder Hotel to the cabin, and to carry a sack of money used at the games. Roberts was

in the habit of going to his cabin every night accompanied by a man carrying the sack. They entered the cabin, and, while Roberts struck a match, something suspicious seemed to occur, and both stepped outside the door. Instantly there was a report of a gun inside the cabin. Roberts crowded witness off the porch, the sack of money fell off witness's shoulder, and he fell off the steps. As he fell he heard the report of a pistol from outside the cabin, and soon heard hurried footsteps close to him. He then heard the report of a gun from inside the cabin, and in a few seconds a man came out, stood on the porch, raised his gun and fired two shots in the direction of the Wonder Hotel, turned to the right in a leisurely manner, got off the steps and disappeared behind the north side of the house. Witness recognized this man as Fitzpatrick, the defendant. As Fitzpatrick disappeared, witness called for help, and Brennan and others came over from the hotel with a lantern. Roberts was found lying on his back, fatally wounded, and almost immediately died.

Brennan, who was at the hotel, saw Roberts start with Ross, with the sack, to go to the cabin. In a few minutes he heard a shot, and started toward the door, but before he got to the door there was another shot, and, when he reached the pavement, still another, which seemed to come from the cabin. Witness ran back to the hotel, got a gun and lantern, ran across the street, found Ross first, and then Roberts on his back dying. There was some other testimony to the same general effect.

The testimony to which objection was made was that of Ballard, a soldier on guard duty at Dyea on the night of the occurrence, who testified that about two o'clock in the morning he heard four or five shots from the direction of Roberts' cabin and the Wonder Hotel, and that some fifteen or twenty minutes or half an hour thereafter, a man came to him. "I was in the cabin, and he rapped on the door, and I went and opened the door for him, and he said he would like to get a doctor. He was shot. . . . I directed him to the hospital in town, and he went that way." Witness said that he did not know the man, but was afterwards told that his name was Corbett. He was brought into court, but witness could not identify him with certainty.

Objection was also made to the testimony of Dr. Price, who swore that about three o'clock in the morning Corbett applied to him for medical assistance; that he was wounded in the right shoulder, and witness was in attendance upon him about three weeks or a month. Also to the testimony of John Cudihee, deputy United States marshal, who arrested Fitzpatrick, Brooks and Corbett the day of the murder, and made 'an investigation. He found Roberts in his cabin dead, then went to Fitzpatrick and Corbett's cabin, and found there a lot of shoes and clothing covered with blood. The witness produced the shoes in evidence, pointed out which pair was Fitzpatrick's and which was Corbett's, explained that Fitzpatrick had identified the shoes in his office, and pointed out which pair was Corbett's and which was his. Witness also pointed out the blood stains on both shoes. Corbett's shoe fitted the footprints in the sand which the witness found in the rear of Roberts' cabin, where the shooting occurred. The shoe had hobnails in it, and the heel of one was worn off so the print in the sand was. a peculiar one.

Objection was made to the admission of any testimony relating to the acts of Corbett, and especially that which occurred after the alleged crime had been committed. No direct testimony appears in the record showing the presence of Corbett at the cabin before, during or after the commission of the crime for which Fitzpatrick was then on trial. Had the statement of Corbett, that he was shot, and inquiring for a doctor, tended in any way to connect Fitzpatrick with the murder, it would doubtless have been inadmissible against him upon the principle announced in *Sparf and Hansen* v. *United States,* 156 U. S. 51, that statements made by one of two joint defendants in the absence of the other defendant, while admissible against the party making the statement, are inadmissible against the other party. In that case declarations of Hansen connecting Sparf with the homicide there involved, tending to prove the guilt of both, and made in the absence of Sparf, were held inadmissible against the latter. This is a familiar principle of law; but the statement of Ballard was not within this rule. Corbett had evidently been wounded, and was asking for a doctor. His accompanying statement that he was shot was clearly compe-

tent to explain his condition, and had no tendency whatever to connect Fitzpatrick with the transaction. This statement, as well as that of Dr. Price, to the effect that he found Corbett with a wound in his right shoulder, and that of Cudihee as to finding a lot of shoes and clothing covered with blood, and connecting one pair of these shoes with the footprints found near Roberts' cabin, were all facts connected with the crime which the government was entitled to lay before the jury. Fitzpatrick and Corbett roomed together. Their bloody clothes and shoes were found in their cabin the morning after the murder. Brooks had roomed with them. Brooks and Corbett in their affidavit for a continuance swore in effect that they were together that night, and attempted to establish a joint alibi.

There was no doubt that a homicide had been committed, and it was the province of the jury to determine whether the defendant was a guilty party. Any fact which had a bearing upon this question, immediate or remote, and occurring at any time. before the incident was closed, was proper for the consideration of the jury. Of course, statements made in the absence of Fitzpatrick implicating him with the murder would not be competent, but none such were admitted; but any act done, whether in Fitzpatrick's presence or not, which had a tendency to connect him with the crime, was proper for the consideration of the jury, and the fact that Corbett was not then on trial is immaterial in this connection. As there was some evidence tending to show a joint action on the part of the three defendants, any fact having a tendency to connect them with the murder was competent upon the trial of Fitzpatrick. The true distinction is between statements made after the fact, which are competent only against the party making the statement, and facts connecting either party with the crime which are competent as a part of the whole transaction. In the trial of either party it is proper to lay before the jury the entire affair, including the acts and conduct of all the defendants from the time the homicide was first contemplated to the time the transaction was closed. It may have a bearing only against the party doing the act, or it may have a remoter bearing upon the other defendants; but such as it is, it is competent to be laid before the jury.

In *People* v. *Cleveland*, 107 Mich. 367, error was assigned by the defendant in permitting the prosecution to show the acts of one Mehan, jointly indicted with Cleveland in the affray; his appearance on the way to Jackson, and on the succeeding days; the excuse he gave for his then condition, and the result of an examination of his clothing. But the court said: " It is apparent from the testimony that the three parties, when they left Jackson, had arranged to engage in this robbery, . . . and the arrangement had been carried out so far as they were able to do so. It was therefore proper to show the condition of Mehan, who was not on trial, for the purpose of establishing his identity as one of the men who accompanied the respondent Cleveland from Jackson to Somerset Center, thus identifying the latter's connection with the robbery."

So, in *Angley* v. *State*, 35 Tex. Crim. Rep. 427, error was assigned upon the admission of testimony to show the character of shoes Rice (who was connected with the transaction but not jointly indicted) had on when arrested the day after the assault. One ground of the objection was that Rice was not jointly indicted with Angley. When Rice was arrested and his shoes examined it was found that one of them had a hole in the sole fitting a corresponding peculiarity in the track found upon the ground. The court held this testimony proper, though Rice was separately indicted, because the conspiracy had been shown. This was a circumstance tending to show that he was one of the parties present at the time the assault was committed.

4. Error is also assigned in not restricting the cross-examination of the plaintiff in error. Defendant himself was the only witness put upon the stand by the defence, who was connected with the transaction; and he was asked but a single question, and that related to his whereabouts upon the night of the murder. To this he answered: " I was up between Clancy's and Kennedy's. I had been in Clancy's up to about half-past twelve or one o'clock—about one o'clock, I guess. I went up to Kennedy's and had a few drinks with Captain Wallace and Billy Kennedy, and I told them I was getting kind of full and I was going home, and along about quarter past one Wallace brought me down about as far as Clancy's, and then he took me down

to the cabin and left me in the cabin, and we wound the alarm clock and set it to go off at six o'clock, and I took off my shoes and lay down on the bunk and woke up at six o'clock in the morning, and went up the street."

On cross-examination the government was permitted, over the objection of defendant's counsel, to ask questions relating to the witness's attire on the night of the shooting, to his acquaintance with Corbett, whether Corbett had shoes of a certain kind, whether witness saw Corbett on the evening of March 12, the night preceding the shooting, whether Corbett roomed with Fitzpatrick in the latter's cabin, and whether witness saw any one else in the cabin besides Brooks and Corbett. The court permitted this upon the theory that it was competent for the prosecution to show every movement of the prisoner during the night, the character of his dress, the places he had visited and the company he had kept.

Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts. The witness having sworn to an alibi, it was perfectly competent for the government to cross-examine him as to every fact which had a bearing upon his whereabouts upon the night of the murder, and as to what he did and the persons with whom he associated that night. Indeed, we know of no reason why an accused person, who takes the stand as a witness, should not be subject to cross-examination as other witnesses are. Had another witness been placed upon the stand by the defence, and sworn that he was with the prisoner at Clancy's and Kennedy's that night, it would clearly have been competent to ask what the prisoner wore, and whether the witness saw Corbett the same night or the night before, and whether they were fellow

occupants of the same room. While the court would probably have no power of compelling an answer to any question, a refusal to answer a proper question put upon cross-examination has been held to be a proper subject of comment to the jury, *State* v. *Ober*, 52 N. H. 459; and it is also held in a large number of cases that when an accused person takes the stand in his own behalf, he is subject to impeachment like other witnesses. If the prosecution should go farther and compel the defendant, on cross-examination, to write his own name or that of another person, when he had not testified in reference thereto in his direct examination, the case of *State* v. *Lurch*, 12 Oregon, 99, is authority for saying that this would be error. It would be a clear case of the defendant being compelled to furnish original evidence against himself. *State* v. *Saunders*, 14 Oregon, 300, is also authority for the proposition that he cannot be compelled to answer as to any facts not relevant to his direct examination.

5. Error is also assigned to the action of the court in permitting the government to call and examine witnesses in rebuttal with respect to the effect of light from the flash of a revolver, and whether such light would be sufficient to enable a person firing the revolver to be identified. One of the witnesses, Ross, testified on cross-examination that although the night was dark, he identified Fitzpatrick by the flash of the pistol shots.

Had the defence put in no evidence whatever upon the subject, the question would have been presented whether it was or was not a matter of discretion for the court to admit this testimony in rebuttal; but in view of the fact that the defence put in a calendar apparently for the purpose of showing the time that the moon rose that night, as having some bearing upon this question, there was no impropriety in putting in this testimony.

There was no error committed upon the trial prejudicial to the defendant, and the judgment of the District Court is therefore

*Affirmed.*