Theo Ervin WILLIAMS, Petitioner–
Appellant,

v.

Robert BORG, Warden, Respondent–
Appellee.

No. 95–15942.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1996.

Decided March 23, 1998.

William T. Lowe, Assistant State Public Defender, San Francisco, California, for petitioner-appellant.

Herbert F. Wilkinson, Deputy Attorney General, San Francisco, California, for respondent-appellee.

Before CANBY and KLEINFELD, Circuit Judges, and COLLINS,* District Judge.

Opinion by Judge KLEINFELD; Dissent by Judge CANBY.

---

* The Honorable Audrey B. Collins, United States District Judge for the Central District of California, sitting by designation.

**KLEINFELD, Circuit Judge:**

Though there are others, the primary issue in this case is whether a judge may constitutionally strike a defendant's testimony if, after warning and after opportunity to change his mind, the defendant refuses to be cross-examined.

## FACTS

Williams appealed the district court's denial of his petition for a writ of habeas corpus, under 28 U.S.C. § 2254. He is serving a life sentence imposed by a California state court, for forcible oral copulation, kidnapping, robbery, and other crimes, committed during the events described below.

The victim testified that Williams grabbed her as she was walking toward her car outside a convenience market. She had just finished having a late-night breakfast with her boyfriend, a bartender, and it was about 3:15 a.m. Williams forced her into the passenger seat of her own car, got into the driver's seat, and drove off. He demanded money, but all she had was $10, not enough for him. She offered Williams her ATM card and the two drove to her bank, but the ATM was closed. Williams then drove to a side street, parked, and forced her to perform oral sex on him. Then he drove about 100 yards, parked, made her get out of the car, and made her perform fellatio again. Williams then drove back to where he had abducted the victim and left, keeping her ATM card. The victim drove away for about ten minutes, then stopped at a gas station and called the police.

A few hours later, the police staked out the ATM to which Williams had taken the victim. They caught him there. Williams and his wife had driven to the machine, and his wife was trying to get money out of the machine with the victim's card, while Williams sat in the car.

Williams took the stand and told an entirely different story. Before he did, the court held a conference out of the jury's presence. Defense counsel had advised Williams not to

testify in order to keep the jury from hearing about his prior convictions, but told the court that Williams might insist. The judge warned Williams that the prosecutor was entitled to use his prior felony convictions to impeach his credibility, although his convictions for unlawful oral copulation would be called "moral turpitude." The judge specifically instructed Williams that if he refused to be cross-examined because the answers might incriminate him, the judge would grant a motion to strike his testimony and tell the jury not to consider it. Williams said he understood all this.

Williams chose to testify after being so advised. He claimed that as he left the convenience store after buying something to drink, the supposed victim drove in front of him, rolled down her window, and asked "did I have any weed for sale." He said he had no marijuana, but had some cocaine. She asked him to get into the car. He offered a gram of cocaine for $100, but all she had with her was $20. They drove to an ATM so she could get more cash, but it was closed. She managed to talk him out of a gram of cocaine anyway, by promising to meet him in the morning and pay him, giving him her ATM card and number so that he could use it if she did not meet him, and volunteered to "show faith" by performing fellatio. Williams testified that "upon weighing her credibility" he decided to trust her, accepted the card and fellatio, and gave her the cocaine.

The cross-examination was short and unsuccessful. The prosecutor asked a series of "Isn't it a fact that ..." questions about seven prior crimes of which Williams had been convicted. They included kidnapping, armed robbery, sex crimes, and others. Williams refused to answer the questions. He said that the answer "may incriminate me in the case at hand right now." The prosecutor asked the judge to instruct the witness that he had to answer the questions and could not avoid them by invoking the Fifth Amendment. The judge obliged. He told Williams "you have no right to invoke the Fifth Amendment and refuse to answer the questions in regard to the prior felony convictions" and expressly ordered Williams to

answer. Williams expressly refused. On the prosecutor's motion, the court then held Williams in contempt, ordered Williams' testimony stricken, and instructed the jury to disregard it. Neither the prosecutor nor defense counsel asked any other questions.

The next morning, the judge offered Williams an opportunity to put things right. He stated that if Williams took the stand and answered the questions, "I would purge you of contempt. I would also permit the jury to consider your direct examination testimony." But Williams turned him down.

## ANALYSIS

### A. Jurisdiction.

■ Appellee argues that Williams filed his notice of appeal too late, so we lack jurisdiction. He had to file "within 30 days after the entry date of entry of the judgment." Fed. R.App. P. 4(a)(1). Williams' attorney argues that he filed timely, as his receipt shows, but that the clerk stamped his notice "filed" the next day, which was late, and his timely filing sufficed under *Aldabe v. Aldabe*, 616 F.2d 1089, 1091 (9th Cir.1980).

We need not resolve whether the notice was timely filed, because, as Williams' attorney correctly argues, the district court clerk never entered judgment "on a separate document," as required by Federal Rule of Civil Procedure 58. The appeal is therefore timely and we have jurisdiction under *Allah v. Superior Court*, 871 F.2d 887, 890 (9th Cir. 1989). We held in that case that the time for filing notice of appeal runs from entry of judgment in compliance with Civil Rules 58 and 79(a), and a party will ordinarily not be found to have exceeded the time allowed by Appellate Rule 4(a) where the clerk has not entered a proper judgment. We also held in that case that if the appellee does not object to appellate jurisdiction on the ground that final judgment has not yet been properly entered in compliance with those rules, then the separate judgment rule is waived, because it is not jurisdictional. We then may exercise jurisdiction on the premature notice of appeal to avoid the pointless exercise of dismissal, remand, entry of judgment, and a second notice. *Id.* at 890, n. 1. Appellee has

not raised the separate judgment rule, so it is waived under *Allah.*

Williams filed his case before Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("the Antiterrorism Act"), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), so we do not analyze it under the new provisions added by that Act. *See Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997).

### B. The Striking of Williams' Testimony.

■ Williams argues that he was deprived of his right to present his own testimony in his defense, and that this violated the Constitution as construed in *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). He claims that because admission of his prior felony convictions would have been merely collateral, the judge was not entitled to strike his testimony in its entirety.

Williams insisted on testifying without being cross-examined on his prior convictions. He was warned before he testified, admonished when he refused to testify, and warned again when he was given a second chance the next morning, that he had no right to refuse to answer the questions and that his testimony would be stricken if he did refuse. He obdurately refused to be cross-examined about his priors. Williams said they "may incriminate me in the case at hand right now." That, of course, was the point.

■ Williams had a fair choice. He could testify, subject to oath and cross-examination. Or he could refuse to testify, and not have his silence used against him. As the California Court of Appeal said in its unpublished opinion in this case, "a defendant with prior convictions must decide whether to take the stand, thereby exposing himself to impeachment based on his priors, or whether to forego his right to testify in his own defense." The Constitution does not give a defendant a right to testify without subjecting himself to cross-examination which might tend to incriminate him. *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *United States v. Nobles,* 422 U.S. 225, 241, 95 S.Ct. 2160, 2171–72, 45 L.Ed.2d 141 (1975).

In a habeas case such as this one, we are limited to deciding "whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). We therefore review only for constitutional violation, not for abuse of discretion.

Williams' constitutional argument is that his right to testify on his own behalf was unconstitutionally abridged by striking his testimony when he refused to answer the questions posed on cross. He relies on *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). That case holds that restrictions on a defendant's right to testify "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 56, 107 S.Ct. at 2711. Williams argues that in this case, they were. We therefore have examined the record to see whether the requirement that Williams subject himself to cross examination about his priors was "arbitrary" or "disproportionate."

"Arbitrary" in this context means without a basis in reason or law. Here, there was a sensible reason for striking the testimony. A witness, including a defendant testifying for himself, is supposed to swear to tell the truth, and then tell it, on cross as well as direct. A defendant is not allowed to tell the jury his story without subjecting himself to the risk of perjury prosecution if he lies, and answering questions designed to expose him as a liar. Williams refused, in violation of an express court order, to answer questions his appellate brief concedes were legitimate on cross-examination. There was nothing arbitrary about the state court's decision.

Williams argued that striking his testimony and telling the jury to disregard it was "disproportionate to the purposes [the restriction on his testimony was] designed to serve." *Rock v. Arkansas,* 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987). The purpose of the judge's sanction was to make Williams answer the questions about his prior felonies, so that the jury could use the answers to evaluate his credibility. The sanction was a measured means to serve an important purpose, especially in light of Williams' opportunity the next morning to

answer the questions and have the sanction withdrawn.

Whether a witness is telling the truth or lying is as important as what the witness says, and there is no better way than cross-examination under oath to help a jury decide whether it is being lied to:

> The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

> Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. It may be that in more than one sense it takes the place in our system which torture occupied in the medieval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth. However difficult it may be for the layman, the scientist, or the foreign jurist to appreciate this its wonderful power, there has probably never been a moment's doubt upon this point in the mind of a lawyer of experience.

V *Wigmore on Evidence* § 1367 (Chadbourne rev. ed.1974). A person's story is not much use to a jury if the jurors are denied the information they need to evaluate how likely it is that the story is true.

Williams told a story that could have been true, that the woman who claimed to be his victim had approached him to buy marijuana, and had traded cash, sex and her ATM card for drugs. Was it true? That Williams was the longtime repeat felon he was greatly increases the probability that his story was a flat lie from start to finish. Without this information, some jurors would probably be skeptical of Williams anyway—there is some implausibility about a drug dealer extending credit to someone he has never met, a woman volunteering sex to show "faith" after the deal has been struck, and a woman voluntarily giving her ATM card to a drug dealer she's never met. But some jurors might give more credit to Williams' story if they were kept ignorant of his convictions, perhaps thinking that a woman out that late at night might have been looking for drugs. All Williams needed for a hung jury was one agnostic about who was telling the truth. Had the jurors been able to learn about all of Williams' felonies, they would have been more likely to think he was lying. After all, lying to a jury was considerably less bad than a lot of other things he had done. The practical significance of striking Williams' testimony was that if a juror started arguing for acquittal based on what he had said, another juror could · rebut by saying "Williams would not answer the questions on cross-examination, and the judge told us we could not consider his testimony."

In *Rock*, the defendant could not cure the prior hypnosis which barred her testimony. But Williams had complete control over whether he could testify or not—all he had to do was answer the questions on cross. The Supreme Court in *Rock* expressed disapproval of rules "applied mechanistically to defeat the ends of justice," *Rock*, 483 U.S. at 55, 107 S.Ct. at 2711, but here the state trial judge treated Williams' obdurateness on an individualized basis. Similarly, in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Mississippi trial court adhered to a "party voucher" rule which had the effect of excluding defense evidence even when highly reliable. *Id.* at 294, 93 S.Ct. at 1045. In the case at bar, there was no mechanical exclusion of testimony. The state trial judge had discretion, and exercised it in a sensible, measured way to enable the jury to hear Williams' story and hear the reasons why they might reasonably be skeptical of it.

Williams seeks to elevate to a constitutional level the distinction between cross-examination on collateral and non-collateral matters. His argument is that even if a judge could strike his testimony for refusal to be cross-examined about non-collateral matters, it is unreasonable to strike his testimony for refusal to be cross-examined about collateral matters. The argument depends on a misunderstanding of the word "collateral," conflating it with the word "unimportant."

■ Collateralness has nothing to do with the rule in *Rock* that restrictions on testimony may not be "arbitrary or disproportionate" to the importance of the testimony in the trial. Whether testimony is important and whether it is collateral are different questions, and any combination of answers is possible. Collateralness sometimes has a lot to do with how important cross-examination is, sometimes not. "Collateral" means that the evidence does not speak directly to the matters put at issue by the indictment. Wigmore defines the terms in the analogous context of impeachment by prior inconsistent statements:

> The only test in vogue that has the qualities of a true test—definiteness, concreteness, and ease of application—is that laid down in *Attorney General v. Hitchcock:* could the fact, as to which the prior self-contradiction is predicated, have been shown in evidence for any purpose independently of the self-contradiction?

> . . . . .

> The simple test is (in the language of Chief Baron Pollock) whether it concerns "a matter which you would be allowed on your part to prove in evidence" independently of the self-contradiction—i.e., if the witness had said nothing on the subject.

IIIA *Wigmore on Evidence* § 1020 (Chadbourne rev. ed.1904, 1970). Thus a witness who testifies "I saw the defendant do such-and-such" is cross-examined on a non-collateral matter if asked the date he saw it, and on a collateral matter if asked whether he has been convicted of perjury or was paid to lie in this case. If the true answer to the perjury question is "yes," jurors may find that information more helpful in deciding whom to believe than any answer to the date question. The non-collateral question may be unimportant, the collateral critically important. Thus collateralness throws little light on proportionality "to the purposes [cross-examination is] designed to serve." *Rock,* 483 U.S. at 56, 107 S.Ct. at 2711.

Williams draws an illogical inference from a remark in *Denham v. Deeds,* 954 F.2d 1501 (9th Cir.1992). In that case, we held that the judge properly excluded the testimony of a defense witness who refused to answer questions on cross-examination. Thus *Denham* cuts against Williams, unless the collateral-non-collateral distinction makes it applicable. In the course of upholding the exclusion of testimony, we said "the truth-seeking function of the court is impaired" when a witness refuses to answer questions "that go to the heart of the direct testimony on a central issue," so exclusion is permitted "when the witness has refused on cross-examination to respond to questions on non-collateral matters." *Id.* at 1504.

Williams takes our remark that exclusion is permitted when the witness refuses to testify to non-collateral matters to imply that exclusion is prohibited when the matters are collateral. His inference does not follow. We did not so hold, and the inference is wrong, logically, legally and practically. "If A then B" does not imply "if not-A then not-B." "All men are mortal" does not imply that non-men are immortal—puppies grow old and die too. Thus *Denham*'s holding, that refusal to answer non-collateral cross justifies exclusion, does not imply that refusal to answer collateral cross does not.

Williams cites *United States v. Negrete–Gonzales,* 966 F.2d 1277 (9th Cir.1992), for the proposition that the trial judge abused his discretion by striking Williams' testimony. But the problem in that case was irrelevance, not collateralness. The district judge struck the defendant's testimony because she refused to disclose, on cross, her source for the drugs she was dealing. She refused to "snitch" because she feared for her life. A defendant's willingness to cooperate in government law enforcement efforts is not merely collateral, but of little or no relevance to whether the witness is telling the truth.

We have frequently upheld bars to defendant's testimony where defendants refused to comply with the procedures used to give the jury a fair chance to evaluate its truth. In *United States v. Gallagher,* 99 F.3d 329 (9th Cir.1996), the defendant wanted to keep talking to the jury after his lawyer had no further questions. We held that prohibiting the narrative was permissible, quoting the statement in *Chambers* that the defendant must "comply with established rules of procedure

and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Gallagher*, 99 F.3d at 332, quoting *Chambers*, 410 U.S. at 302, 93 S.Ct. at 1049. *Accord United States v. Moreno*, 102 F.3d 994, 998 (9th Cir.1996) (constitutional right to testify is not violated by exclusion of irrelevant testimony).

In *United States v. Panza*, 612 F.2d 432 (9th Cir.1979), we affirmed striking a defendant's testimony, because he refused to answer several questions on cross about collateral and non-collateral matters. In *Panza* we expressly "reject[ed] the suggestion that striking testimony is necessarily a last resort, to be used only when all other sanctions appear ineffective." *Id.* at 439. That was direct review for abuse of discretion, so a fortiori habeas review for unconstitutional arbitrariness or disproportionality would have reached the same result.

"[T]he right to testify carries with it the obligation to submit to cross-examination." *United States v. Martinez*, 883 F.2d 750, 754 (9th Cir.1989). Williams wanted the right without the obligation. We decline to give it to him.

## C. Double Jeopardy.

█ Among Williams' convictions in this case were kidnapping to commit robbery, Cal.Penal Code § 209(b). He was also convicted of two counts of oral copulation by means of force, Cal.Penal Code § 288a(c). On each of the oral copulation counts, the jury found that Williams had kidnapped the victim for the purpose of committing the sexual offense; that finding was a sentence enhancement, not a separate crime. Cal.Penal Code § 667.8(a).

Williams argues that his convictions violated the Double Jeopardy Clause, because there was only one kidnapping, yet he was punished twice for it, as though it had been two separate kidnappings. The argument is wrong because he was not convicted of two kidnappings. He was convicted of only one, to commit robbery, count 2 of the indictment.

He was convicted of two forcible oral copulations, counts 3 and 4. Those two convictions did not require two separate kidnappings,

though under state law the state court concluded that there were. The prosecutor had urged that there was a second kidnapping with a sexual purpose, when after Williams had gotten the victim's money and ATM card, he made her drive to a different location where he forced her to orally copulate him. But the way the indictment and verdict form were written, the additional convictions were based on two oral copulations, both against the victim's will and compelled by force, not an additional and separate kidnapping. That is the crime designated by counts 3 and 4, Cal.Penal Code § 288a(c). Williams made the victim orally copulate him twice, once inside the car, once in a different location outside the car.

The way kidnapping affects the oral copulation counts is by increasing the sentence, from 3, 6 or 8 years, to 12, 15, or 17 years. Cal.Penal Code § 667.8(a). The enhancement statute says that a person convicted of forcible oral copulation "who, for the purpose of committing that sexual offense, kidnapped the victim ... shall be punished by an additional term of 9 years." Cal.Penal Code § 667.8(a). Both oral copulations deserved the enhancement, because the jury found that Williams kidnapped the victim to make her perform them. The verdict establishes that Williams kidnapped the victim with two purposes, to take her money and to make her perform fellatio on him. There is nothing illogical or implausible about supposing that a criminal kidnapped a woman with multiple evil purposes. Count 4 was not a separate count charging kidnapping. Counts 3 and 4 are identical, and each charges forcible oral copulation, because Williams did that twice. Each of the two oral copulation counts says "[i]t is further alleged" that Williams kidnapped the victim "for the purpose" of committing forcible oral copulation.

█ Multiple convictions resulting from same act, such as a single incident of kidnapping, do not violate the Double Jeopardy Clause if each offense "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). A conviction for kidnapping to commit robbery and an enhancement for kidnapping to commit

forced oral copulation require proof of different facts. *Compare* Cal.Penal Code § 209 *with* Cal.Penal Code § 667.8. Therefore, Williams' sentence does not violate double jeopardy.

■ Nor does enhancement of punishment of one offense because it was committed in the course of another, also charged, violate the Double Jeopardy Clause.

> Where ... a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those statutes proscribe the "same" conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.

*Missouri v. Hunter,* 459 U.S. 359, 368–69, 103 S.Ct. 673, 679–80, 74 L.Ed.2d 535 (1983).

### D. Prosecutorial Misconduct.

■ Williams argues that prejudicial misconduct of the prosecutor in closing argument deprived him of due process. His theory is that the end of the prosecutor's closing argument, after detailed discussion of the evidence for each count, suggested that Williams should be punished for exercising his right to jury trial and his right to remain silent rather than testify, and improperly maligned defense counsel.

"The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). They did not.

In the context of this trial, nothing can be construed as a comment on the defendant's exercise of his right to remain silent. What the prosecutor was referring to was that Williams' testimony had been stricken so the jury could not treat it as defense evidence. Williams did not remain silent. He testified. That his testimony was stricken does not mean that he remained silent. It means that the jury was told to disregard his distinctly non-silent trial conduct because he refused to answer questions on cross-examination. The

trial judge specifically concluded, and Williams claims no error in this, that Williams had no right to remain silent with respect to the cross-examination.

■ The prosecutor pointed out the strengths of his case and the lack of defense evidence to challenge it, such as Williams' failure to call the woman who was with him when they were trying to get money from the ATM the next morning, and then asked rhetorically, "Why are we here?" He answered his own question by saying that anyone charged has a right to a jury trial, proof of the charges against him, to remain silent, to produce no evidence, and so forth. Then he made his ambiguous remark:

> [The victim] came in and told you and relived something she didn't even want to remember anymore but had no choice. The defendant had a right to do that. He can force this innocent victim to come in here and relive that night of terror in front of all of you. He can do that, and he's done it. And now, ladies and gentlemen, it's time for him to pay the price, and the price is a conviction.

"Pay the price" for what? Going to trial? Or kidnapping, sexually assaulting, and robbing? The remark could be construed either way. Because "improvisation frequently results in syntax left imperfect and meaning less than crystal clear," "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974). A more refined articulation of his argument by the prosecutor would have avoided the problematic ambiguity, but in the context of the argument as a whole and the trial that led up to it, it is fair to infer that "the price" was to be paid for the crimes.

■ Williams argues that the prosecutor called him "stupid" four times, and once referred to defense counsel's argument as "trash." Stupidity is among the least negative characteristics that might be attributed to Williams, and might even be claimed as a mitigating characteristic, as it often is in

sentencing arguments. We cannot see how it could unfairly have prejudiced him. Calling an argument on his behalf "trash" cannot be characterized as improper. *See United States v. Davis*, 15 F.3d 1393, 1402–03 (7th Cir.1994). (prosecutor's references to defendant's case as "trash," "hogwash," and "garbage" did not deny defendant due process). He did not say the man was "trash"; he said the argument was. A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal.

There is one troubling part of the prosecutor's argument, and that is his attack on defense counsel personally. He argued that the defense lawyer had concocted a scheme for letting the jury hear Williams' story even though it would be stricken for Williams' refusal to answer questions on cross-examination:

> It's the cheapest lawyer's tactic in the book, and I'm going to tell you how it works. You remember Kramer versus Kramer? There was a scene in the movie Kramer versus Kramer where Dustin Hoffman's lawyer puts into evidence something he knows is inadmissible. And after that there's a close-up shot and the judge says, "The jury will disregard that." Then there's a close-up shot of Hoffman and [his] lawyer. Hoffman says, "How can they disregard it if they heard it?" And the lawyer says, "They can't."

> Ladies and gentlemen, that's the tactic I'm talking about. I don't think I have to spell it out any further than that for you. You've seen it. It is a despicable and cheap tactic to get off a guilty man who assaulted and violated [the victim], and now comes in here with a cheap trick to try and get you to send him out the door.

Perhaps the movie was recent enough so that the prosecutor thought that was what defense counsel had done. It is also plausible that Williams concocted the scheme and made his lawyer yet another victim of his criminality. Williams' use of legal terminology, and his lawyer's advice that he not testify, lend weight to that possibility.

■ Absent specific evidence in the record, defense counsel should not be maligned. *United States v. Frederick*, 78 F.3d 1370,

1380 (9th Cir.1996). Generally it is unprofessional for the prosecutor to try the defendant's lawyer instead of the defendant even if there is specific evidence. But the comments did not so infect the trial with unfairness as to require that the verdict be set aside. For one thing, there was some evidence from which a suspicious prosecutor could have drawn the inference. For another, even if the prosecutor's attention was focused on the other lawyer in the courtroom, the evidence of the crime was so dramatic that it is hard to imagine that the jury was much distracted from Williams and his victim. "[P]rosecutorial comment must be examined in context." *United States v. Robinson*, 485 U.S. 25, 33, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988). The context was that the only defense evidence that had come in was stricken because Williams refused to obey the judge's order to answer the questions on cross-examination. Williams' testimony, though stricken, might create a reasonable doubt in the mind of at least one juror. The prosecutor therefore had to make sure the jury did not forget that it was stricken. With Williams' testimony stricken, the evidence of guilt was overwhelming. "[T]he overwhelming evidence of [Williams' guilt] eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *United States v. Young*, 470 U.S. 1, 19, 105 S.Ct. 1038, 1048, 84 L.Ed.2d 1 (1985). Though his attack should have focused on Williams, the prosecutor's remark did not so infect the trial with unfairness as to deny Williams due process.

AFFIRMED.

CANBY, Circuit Judge, dissenting in part:

I dissent from that portion of Judge Kleinfeld's opinion that upholds the striking of Williams' entire testimony. As the majority recognizes, the standard to be applied to determine whether a defendant's testimony may be stricken is that of *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987):

> [R]estrictions of a defendant's right to testify may not be arbitrary or *disproportionate to the purposes they are designed to serve.* In applying its evidentiary rules a

State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify.

*Id.* at 55–56, 107 S.Ct. at 2711 (emphasis added). In my view, the striking of all of Williams' testimony was disproportionate to the purposes the sanction was designed to serve.

"[S]triking a witness's entire testimony is an extreme sanction, not to be lightly imposed." *United States v. Negrete–Gonzales,* 966 F.2d 1277, 1280 (9th Cir.1992). As *Rock* makes clear, striking the testimony of the defendant himself is even more extreme. "[T]he most important witness for the defense in many criminal cases is the defendant himself." *Rock,* 483 U.S. at 52, 107 S.Ct. at 2709. The defendant's right to testify is protected not only by the due process clause; it is also protected by the Sixth Amendment and is a corollary to the Fifth Amendment guarantee against self-incrimination. *Id.* at 51–52, 107 S.Ct. at 2708–10.

In reaching a proper balance between the constitutional right of the defendant to present a case and the need for an effective adversarial process, we have made use of the distinction between collateral and non-collateral matters on cross-examination.

> Where a defense witness's invocation of Fifth Amendment protection against self-incrimination amounts to a refusal to be cross-examined, the testimony cannot be considered reliable. We therefore join with those circuits that have permitted the exclusion of a defense witness's testimony *when the witness has refused on cross-examination to respond to questions on non-collateral matters.*

*Denham,* 954 F.2d at 1504 (emphasis added). In *Denham,* we held that the testimony in that case was properly stricken because "the questions which [the witness] refused to answer were *germane to his testimony on direct examination and therefore not collateral.*" *Id.* (emphasis added). A fair reading of these comments surely indicates that the distinction between collateral and non-collateral matters is relevant to a determination whether a defense witness's testimony should be stricken. In normal circumstances a finding

that the questions a witness refused to answer related to collateral matters means that the governmental interest in a full and fair presentation of the evidence is not sufficiently strong to overcome the defendant's right to present witnesses. *See Negrete–Gonzales,* 966 F.2d at 1280; *see also United States v. Lord,* 711 F.2d 887, 892 (9th Cir.1983).

The questions that Williams refused to answer were collateral because they did not relate to his direct testimony. There is no indication that Williams would have refused to answer questions other than those relating to his prior conviction, because he was never given the chance; no such questions were asked on cross-examination.

The district court concluded that the questions Williams refused to answer did not relate to collateral matters because the prior convictions affected credibility, and credibility was obviously a crucial issue in the case. But cross-examination on collateral matters often affects general credibility; that fact does not make the matters examined any less collateral. Other courts have made the distinction "between cases in which the assertion of the privilege merely precludes inquiry into *collateral matters which bear only on the credibility* of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness testified on direct examination." *United States v. Cardillo,* 316 F.2d 606, 611 (2d Cir.) (emphasis added), *cert. denied,* 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); *see United States v. Gullett,* 713 F.2d 1203, 1209 (6th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984). We have made the same distinction in finding no plain error in the refusal to strike a prosecution witness's testimony. *United States v. Norman,* 402 F.2d 73, 76–77 (9th Cir.1968), *cert. denied,* 397 U.S. 938, 90 S.Ct. 949, 25 L.Ed.2d 119 (1970).

In the one case in which our court has upheld the striking of a defendant's entire testimony, we again recognized the distinction between cross-examination on collateral matters and cross-examination relating to the defendant's direct testimony. *United States v. Panza,* 612 F.2d 432, 439 (9th Cir.1979), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3019, 65

L.Ed.2d 1118 (1980). In *Panza*, the defendant testified that he had not committed the bank robbery with which he was charged, but had been recruited only to transport money for two unnamed individuals. *Id.* at 435. On cross-examination he refused to identify one of the unnamed individuals, and also refused to answer certain other questions regarding his activities. *Id.* at 435–36. The trial court struck his testimony in its entirety. *Id.* at 436. On appeal, we held that the sanction was appropriate, and in doing so we made several points that the State relies upon here. We said that the trial court should retain discretion to sanction contumacious defendants, and that the sanction of striking the defendant's entire testimony did not have to be a last resort. *Id.* at 439. But we said these things only after pointing out that "[t]he questions asked by the prosecution were directed at the core of the defense Panza had outlined in his direct testimony." *Id.* We also said that "[w]here the defendant's refusal touches only collateral matters, striking his testimony may be an abuse of discretion." *Id.; see also Magyar v. United Fire Ins. Co.*, 811 F.2d 1330, 1331 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987).

Although these decisions involved federal prosecutions, in which the reviewing court had supervisory power over the trial court, we applied the collateral-non-collateral distinction to a state court prosecution, as a constitutional matter, in *Denham v. Deeds*, 954 F.2d at 1504. And *Rock* itself makes clear that the Constitution limits the states in precluding a criminal defendant from testifying.

The fact that the questions Williams refused to answer related to collateral matters therefore weighs in Williams' favor in the balancing required by *Rock*. So do the facts that his right to testify is protected by the Fifth and Sixth Amendments, and that his testimony constituted virtually his entire case. If the jury was to acquit, it could do so rationally only by accepting his testimony.

On the State's side, there is no question that the interest in protecting the truth-seeking function of the adversarial process is a very high one. In deciding, however,

whether the sanction of striking all of Williams' testimony was disproportionate, we ought not to ignore the existence of less drastic alternatives that would accomplish the State's purpose. *See Rock*, 483 U.S. at 61, 107 S.Ct. at 2714 (stating that "[t]he more traditional means of assessing accuracy of testimony also remain applicable in the case of a previously hypnotized defendant"). A variety of sanctions was available to eliminate the effect of Williams' refusal to answer questions concerning his prior convictions. The court could have instructed the jury upon the adverse inferences it might draw from the refusal to answer questions, *Caminetti v. United States*, 242 U.S. 470, 494–95, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917), and it could have allowed the prosecutor to comment upon this refusal during closing argument, *Fitzpatrick v. United States*, 178 U.S. 304, 315–16, 20 S.Ct. 944, 948–49, 44 L.Ed. 1078 (1900). The court could have allowed proof of the prior convictions by documentary evidence. Cal. Evid.Code § 788. These alternatives could have virtually eliminated any impediment to the truth-seeking function posed by Williams' refusal to answer questions about his convictions. With these alternatives available, the sanction of striking all of Williams' testimony was "disproportionate to the purposes" it was intended to serve. *See Rock*, 483 U.S. at 56, 107 S.Ct. at 2711.

I fully recognize that there is something particularly grating about a defendant who insists upon testifying on his own terms. The contempt remedy remains available for such contumacious behavior, however. The penalty of striking Williams' entire defense to charges resulting in a sentence of life imprisonment is disproportionate to the offense of refusing to answer questions about his prior convictions. I therefore dissent on this issue.

In all other respects, I join Judge Kleinfeld's opinion.