*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
CRISFIELD, GASTON, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**James A. HALE III**
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

**No. 201600015**

Decided: 5 October 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
John L. Ferriter (arraignment)
Matthew J. Kent (motions and trial)

Sentence adjudged 14 November 2018 by a general court-martial convened at Elmendorf Air Force Base, Alaska, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, forfeiture of all pay and allowances, confinement for 25 years, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Jeremy J. Wall, JAGC, USN*

For Appellee:
*Lieutenant Kevin G. Edwards II, JAGC, USN*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*

Senior Judge GASTON delivered the opinion of the Court, in which Chief Judge Emeritus CRISFIELD and Judge STEWART joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

GASTON, Senior Judge:

This case is before us a second time. At his first general court-martial, Appellant was found guilty of various offenses and sentenced to reduction to E-1, forfeiture of all pay and allowances, confinement for 26 years, and a dishonorable discharge. On appeal, we held that his trial defense counsel's undisclosed conflicts of interest deprived him of the effective assistance of counsel, and we set aside the findings and sentence and authorized a rehearing. *United States v. Hale*, 76 M.J. 713 (N-M. Ct. Crim. App. 2017).

At his second trial, Appellant was found guilty, pursuant to his pleas, of violation of a lawful general order and wrongful use of an anabolic steroid in violation of Articles 92 and 112a, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 892, 912a (2012). He was additionally found guilty, contrary to his pleas, of rape, aggravated assault, adultery, kidnapping, and indecent language in violation of Articles 120, 128, and 134, UCMJ.

He now asserts two assignments of error [AOEs]: (1) the military judge erred by not suppressing evidence obtained from the search of Appellant's gym bag and subsequent urinalysis; and (2) the evidence is factually insufficient to sustain Appellant's convictions for the offenses to which he pleaded not guilty. We find no prejudicial error and affirm.

## I. BACKGROUND

While assigned to recruiting duty in Anchorage, Alaska, Appellant became involved with a prostitute, Ms. "Kelly,"[1] whom he met online, texted and talked with on the phone, and eventually met in person. Ms. Kelly provided the following testimony at trial. On an afternoon in late-August 2013, Appellant picked her up in his truck and took her to buy illegal drugs— i.e., painkillers—for him. He then dropped her off, and she used the money

---

[1] All names in this opinion, other than those of the judges and counsel, are pseudonyms.

she gained during the transaction to purchase and use crack cocaine. He picked her up again later that night and gave her money to buy more pain-killers for him, but this time he was unhappy with the pills she brought back. When the dealer she bought them from was unwilling to provide a refund, Appellant became angry, pulled a black handgun out of the center-console area of his truck, pointed it at Ms. Kelly, and drove to a secluded area, where he had her empty her pockets and take her clothes off and forced her to perform oral sex on him. He then placed the gun on the dashboard and vaginally raped her across the front seats of his truck with her head toward the passenger door, such that she could feel the seatbelt buckler scraping against her lower back. After he ejaculated, he had her put her clothes back on, put her out of the truck, said something to the effect of "Welcome to the HIV world, whore," and then drove off, keeping her phone and identification.

Ms. Kelly ran to a nearby house, where, crying and disoriented, she told the residents she had been attacked by a sex client who hit her on the head with a gun, took her money and phone, and shoved her out of his vehicle. While she did not say she was raped or forced to have sex, she said he told her he had AIDS when he was penetrating her. The residents of the house helped her get a taxicab back to the women's shelter where she had been living for over two years, having had her stay extended longer than the usual resident's. Once there, she appeared visibly shaken as she reported to a staff member that she had been assaulted and raped. The staff member encouraged her to call the police.

The following day, Ms. Kelly reported what happened to the Anchorage Police Department [APD], describing Appellant as a "buff" Marine named "Jay" with whom she had texted and talked on the phone before meeting in person. An admitted prostitute and drug user, Ms. Kelly testified at trial that she did not call the police immediately after the assault because they had not been helpful to her in the past. Not wanting to get herself in trouble, she did not initially mention the drug transactions in her account of Appellant kidnapping and raping her at gunpoint, which was otherwise substantially consistent with how she later testified at trial. After her police interview, she underwent a sexual assault forensic examination [SAFE], which noted no vaginal injuries but did document and photograph scratch marks on the lower left side of her back that were consistent with being scraped by a seatbelt buckler. Swabs collected from her vagina and cervix later tested positive for semen that was a match for Appellant's DNA.

A month later, the APD identified Appellant through phone records and surveillance video from a store Ms. Kelly had visited with him, and apprehended him at a local gym. Before leaving the gym, Appellant notified the arresting officers about a gym bag he had placed in one of the gym lockers.

He requested that the officers access the bag and get his truck keys, so that the door locks to his truck would not be damaged when it was towed to the APD station. One of the officers retrieved the gym bag, got the truck keys out of it, and put it in the trunk of his patrol car without further searching it. Appellant was then taken to the APD station, where he was turned over to a police detective along with his truck keys, phone, and gym bag.

During his interrogation, after waiving his rights, Appellant gave the following account to the APD detective. He got in touch with Ms. Kelly through an online site listing her as a prostitute, and they texted a few times and talked on the phone. When they eventually agreed to meet in person for sex, he picked her up in his truck and gave her the money, but she started talking about drugs and then said she was too busy to have sex and would have to meet him later, so he dropped her off. He picked her up again later that night, and she directed him to a location where they had sexual intercourse across the front seats of his truck. As they were getting ready to have sex, he pulled a loaded .40-caliber Beretta handgun out from between the front seats and moved it to the dashboard to get it out of the way. He did not point the gun at Ms. Kelly, threaten her with it, or force her to have sex, and had never pointed a weapon at anybody or done anything like that. When he ejaculated during intercourse, his condom broke, which upset Ms. Kelly and she tried to increase her fee. When he refused to pay her more money, she threatened to tell everyone at his recruiting office about what happened. At that point he told her to get out of his truck, drove off, and later threw her belongings out the window. Appellant stated that he occasionally used painkillers that were prescribed to him and previously used certain steroids before they became illegal, but not during his time in the Marine Corps.

After Appellant's interrogation, the APD detective immediately went and obtained warrants from a local magistrate to search Appellant's cellular phone (for text messages and other evidence pertaining to Ms. Kelly), person (for his DNA and truck keys), and truck (for the gun, Ms. Kelly's belongings, and evidence of sexual intercourse). The detective did not obtain a warrant to search Appellant's gym bag. When the detective returned to the interrogation room, Appellant told him the cell phone he had used to communicate with Ms. Kelly was at his apartment. The detective then said he would need to get the phone from Appellant's apartment and offered to give Appellant a ride there to retrieve the phone, which Appellant accepted.

The detective then returned Appellant's gym bag to him. But because Appellant would be (a) waiting in the lobby until they left the police station and (b) riding in the detective's car—with access to the gym bag—while on the way to Appellant's apartment, for officer safety the detective searched the bag to check for guns or other weapons. As the detective was searching the

bag for weapons, he came across a depressed syringe, a needle, and an empty drug-tablet "blister" packet. The detective did not seize these items, but photographed them as he believed they might be evidence of a crime under military law. He then returned the gym bag to Appellant and went to Appellant's truck, where he retrieved Appellant's apartment keys and found a loaded, black, .40-caliber Beretta handgun tucked between the front seats beneath the center console.

Appellant's command was notified of the APD investigation, including what was found in Appellant's gym bag. Based on this information and his own observations of Appellant's rapid gain of muscle mass during the preceding weeks, Appellant's commander found probable cause to order Appellant to undergo urinalysis. Appellant's urine sample tested positive for a metabolite of an anabolic steroid called Boldenone, a Schedule III controlled substance. *See* 21 U.S.C. § 812 (2012). Designed to help the body build muscle mass, Boldenone is formulated so that if injected into a large muscle group, it is gradually released into the body and can remain at a detectable level for as long as two to three months. The drug-tablet blister packet found in Appellant's bag was labelled clomiphene citrate, a substance bodybuilders use to kick start the body's natural production of testosterone after completion of a steroid cycle.

Upon referral of charges, the Government moved for an admissibility ruling regarding the evidence obtained from the gym bag and the urinalysis, which the Defense opposed. The military judge ruled admissible both the evidence obtained during the search of the gym bag and the derivative urinalysis evidence. Upon receiving this ruling, Appellant pleaded guilty unconditionally to wrongfully using Boldenone between 1 April and 1 October 2013. During providency, he admitted using a syringe to inject himself intramuscularly with the steroid three times during this period at his apartment in Anchorage, Alaska, in order to increase his appetite and help him gain weight.

The Government introduced the evidence obtained from Appellant's gym bag and subsequent urinalysis in its case-in-chief on the offenses to which Appellant pleaded not guilty. The Government used the evidence as proof of motive under Military Rule of Evidence 404(b) to support its theory that Appellant was experiencing "roid rage" during the kidnapping, assault, and rape of Ms. Kelly. Government experts testified to how Boldenone and clomiphene citrate work and opined that steroid use is known to cause irritability, verbal and physical aggressiveness, and increased sex drive, which can lead to an increased risk of sexually violent behavior.

The Government also introduced other evidence of Appellant's prior drug use and assaultive conduct. Appellant's first wife testified that in 2003, after

she rebuffed his sexual advances, he forcibly raped her anally. She also testified that in 2004, after accusing her of infidelity, he pointed an unloaded gun at her, pulled the trigger, and later strangled her and threatened to kill their daughter if she took her from him. Appellant's ex-fiancée testified that during their relationship (2006-2012) she observed him using painkillers that he had obtained without a prescription; that she saw him with vials of what he identified to be steroids; that he talked about using the steroids to help him build muscle mass; and that when she visited him in Alaska in May 2013 (three months before Ms. Kelly reported being raped by Appellant), she found a used syringe in a garbage can in his apartment.

At trial, Appellant testified in own defense as follows. He sent not just a few, but upwards of a hundred text messages to Ms. Kelly in which they discussed various topics, including her prostitution services. When they eventually met to have sex, she brought up the subject of drugs, but he did not have her buy any drugs for him. He paid her $40.00 for oral sex as they had agreed, and she had him drive her to a location where she disappeared around the corner of a building. After 15-20 minutes she returned happier and more upbeat. He then told her he did not have time and had somewhere else to be. She said she no longer had the money Appellant had given her, but that they could meet later that night to finish their "date." When he picked her up later that night, she convinced him to pay an additional $20.00 for vaginal sex, then had him take her to meet someone, after which she came back to the truck bubbly as before. She then had him drive to a secluded parking lot, where she pulled out a condom, put it on him, and they began having sex. She hit her wrist on the loaded handgun that he kept in "condition one"[2] between his truck's front seat and center console, so he put it up on the dashboard. They had sex in multiple sexual positions due to the confines of the truck's front seat area, and the condom she gave him was too small and broke during ejaculation. This upset her, and she wanted him to pay an additional $50.00, which he refused to do. They argued about the fee increase until she finally said to forget it and just take her home. Instead, he told her to get out of the truck and drove off. He later noticed her phone and identification cards in the truck, and threw them out the window.

Appellant also testified to being HIV-negative; to having unlawfully used painkillers without a prescription; and to lying to the APD detective when he said he had only used steroids while out of the Marine Corps.

---

[2] A handgun in "condition one" has a round in the chamber and can be fired immediately.

In response to Ms. Kelly's testimony about her cocaine use, a Defense expert testified that cocaine users experience euphoria while using the drug and when they come down from this high, become frantic and paranoid. The expert also challenged the scientific foundation of the Government expert's opinion that steroids like Boldenone cause users to be at increased risk for sexual violence.

## II. DISCUSSION

### A. Suppression Motion

Appellant asserts the military judge erred in failing to suppress the evidence obtained from the gym bag and the derivative urinalysis. We review such rulings by the trial court for an abuse of discretion. *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted).

#### 1. Waiver

As an initial matter, the Government argues Appellant waived the suppression issue when he pleaded guilty unconditionally to wrongful use of Boldenone. "Whether an appellant has waived an issue is a legal question that this Court reviews de novo. Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citation and internal quotation marks omitted).

"[An unconditional] plea of guilty to an offense that results in a finding of guilty waives all issues under the Fourth Amendment to the Constitution of the United States and Mil. R. Evid. 311-317 *with respect to the offense*, whether or not raised prior to plea." Mil. R. Evid. 311(e) (emphasis added); *see also* R.C.M. 910(j) ("Except as provided in [the rule relating to conditional pleas],[3] a plea of guilty which results in a finding of guilty waives any objec-

---

[3] Conditional pleas are those into which an accused may enter "[w]ith the approval of the military judge and the consent of the Government . . . reserving the right, on further review or appeal, to review of the adverse determination of any specified pretrial motion. If the accused prevails on further review or appeal, the accused shall be allowed to withdraw the plea of guilty." R.C.M. 910(a)(2).

tion, whether or not previously raised, insofar as the objection relates to *the factual issue of guilt of the offense(s) to which the plea was made*.") (emphasis added). On the face of the rule, an unconditional plea of guilty waives any suppression issues with respect to the offense to which the accused pleads guilty; however, the rule's language leaves open the question of whether the same suppression issues are waived with respect to any offenses to which the accused pleads not guilty.

Our superior court has held that this issue "cannot simply be determined by [an] appellant's pleas of not guilty" to one or more other offenses. *United States v. Cooper*, 32 M.J. 83, 86 (C.A.A.F. 1991). Rather, courts must examine whether the accused's guilty plea has "judicially admitted the essential facts" that the evidence at issue would establish. *United States v. Hamil*, 35 C.M.R. 82, 83 (C.M.A. 1964). The rationale for this principle is that

> the right to be free from unreasonable search and seizure is not judicially recognized as a mere abstract principle, but is vindicated by keeping out of evidence the results of the search or seizure. If a fact is judicially admitted by the accused, no legal or practical purpose can be served by reviewing the propriety of the search which produced some evidence of the conceded fact.

*Id.* Thus, in this regard, "[a] voluntary and informed plea of guilty does not necessarily preclude appellate review of the denial of the constitutionally protected right of an accused." *Id.*

The examination for judicial admission essentially looks at whether "the defense [did or] did not act in a way which preserved appellant's Fourth Amendment claim." *Cooper*, 32 M.J. at 86. In *Cooper*, after the military judge denied a motion to suppress certain seized evidence connecting the victim and his vehicle to the crime scene, the appellant pleaded guilty unconditionally to adultery, but not guilty to rape. *Id.* at 84-85. The government admitted a laboratory report derived from the seized evidence in its case-in-chief to prove the victim's presence in the appellant's car, which was corroborated by other evidence not subject to the suppression motion. The appellant then elected to defend himself on grounds of consent, requested the members be informed of his guilty plea to adultery prior to the contested trial, stipulated he had sex with the victim in his car during the incident in question (contrary to his pretrial statements denying that the victim was ever in his car at the crime scene), and testified that the sex they had was consensual. The appellant was convicted of rape, after which the military judge set aside the adultery conviction as a lesser-included offense. On appeal, the court held that Cooper's plea of not guilty to rape did not preserve the suppression issue, in part because his "plea [to adultery] and the ensuing finding of guilty were to a lesser-included offense of the rape charge and extended to admission of

the precise element of proof for which the seized items were offered." *Id.* at 85.

In addition to considering facts established by an accused's guilty plea, the examination for judicial admission also looks at "inferences to be drawn from his own freely given testimony concerning the fruits of the searches." *United States v. Woodruff*, 29 C.M.R. 84, 86 (C.M.A. 1960). In *Woodruff*, the appellant, suspected of barracks theft, was asked to identify his baggage at a train depot without being advised of his rights under Article 31, UCMJ. His bag was then searched and found to contain two stolen cameras. After his motion to suppress the search was denied, he pleaded not guilty to larceny. At trial, he took the stand in his own defense and testified he had no idea how the cameras got into his bag and that he must have put them there by mistake. Because the appellant's testimony conceded that the stolen cameras were found in his bag, the court concluded that any error in the suppression ruling—which was focused precisely on the issue of whether the evidence was lawfully obtained from his bag—was "overcome by the accused's later judicial declarations." *Id.* at 86.

Here, the Article 112a offense to which Appellant pleaded guilty is not a lesser-included offense that effectively established an element of a contested offense. Rather, it is a *completely different offense* that was connected to the Appellant's contested trial only by the Government's use of the related evidence as proof of motive for the contested offenses. Unlike the appellant in *Cooper*, Appellant did not affirmatively incorporate the steroid evidence into his defense or in-court testimony. He did not request that the members be informed of his guilty plea prior to trial or otherwise seek to explain or expound upon his wrongful use of Boldenone. His defense was simply directed at confronting the Government's evidence on the contested offenses, including attacking the scientific foundation of the Government expert's testimony about "roid rage."

Nor did Appellant concede during his trial testimony that the drug-related evidence was found in his gym bag, such that we may conclude he judicially admitted possessing or using the items found therein. Unlike the appellant's testimony in *Woodruff*, Appellant's direct testimony was limited to addressing the Government's evidence on the contested offenses, maintaining they did not happen, as opposed to offering an explanation for the evidence obtained during the contested search. Only during cross-examination did Appellant admit that he lied to the APD detective about not using steroids while on active duty, which we find insufficient to constitute a judicial admission as to the contested offenses. *See United States v. Pruitt*, 30 C.M.R. 322, 331 (C.M.A. 1961) (Ferguson, J., concurring in part and dissenting in part) (where an accused's direct testimony is properly limited to confronting a

particular charge, the rule regarding judicial admission / confession applies only that charge).

We conclude that Appellant's unconditional guilty plea to wrongful use of Boldenone waived any and all suppression issues only with respect to *that offense*. It did not waive such issues with respect to the evidence's use under Military Rule of Evidence 404(b) as proof of motive for his commission of the *other* offenses that he pleaded not guilty to and contested at trial.

### 2. Search Incident to Apprehension

Accordingly, we move to the substance of Appellant's AOE regarding the trial court's suppression ruling. Evidence obtained as a result of an unlawful search or seizure by a governmental agent is generally inadmissible against an accused if:

> (1) the accused makes a timely motion to suppress or an objection to the evidence under this rule; (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.

Mil. R. Evid. 311(a).

Here, the military judge ruled the evidence obtained from the gym bag admissible as the fruits of a lawful search and the urinalysis evidence admissible as derivative of that lawful search. He concluded that the search of the gym bag was lawful for several reasons: (1) as obtained within the scope of a valid search warrant based on probable cause; (2) as obtained during the APD detective's good faith execution of a search warrant; and (3) as obtained during a search conducted for officer safety that was reasonable and necessary under the totality of circumstances.[4] We focus our analysis on the military judge's third rationale, that the evidence was found during a reasonable search conducted for purposes of officer safety.

---

[4] App. Ex. LXIX.

"Evidence is admissible if seized in a search of a person who has been lawfully apprehended or if seized as a result of a reasonable protective sweep." Mil. R. Evid. 314(g)(1). Searches incident to apprehension

> include a search for weapons . . . in the area within the immediate control of a person who has been apprehended. "Immediate control" means that area in which the individual searching could reasonably believe that the person apprehended could reach with a sudden movement to obtain such property.

Mil. R. Evid. 314(g)(2). Searches incident to apprehension are "full" searches, as opposed to the more limited protective searches incident to investigatory stops under *Terry v. Ohio*, 392 U.S. 1 (1968), and they are not invalidated by even a substantial delay between the apprehension and the search. *United States v. Curtis*, 44 M.J. 106, 143 (C.A.A.F. 1996) (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973); *Gustafson v. Florida*, 414 U.S. 260, 264 (1973)). As the Supreme Court has explained,

> Once the accused is lawfully arrested and is in custody, *the effects in his possession* at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and the subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. . . . *"While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence."*

*United States v. Edwards*, 415 U.S. 800, 807 (1974) (quoting *United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970)) (emphasis added) (finding 10-hour delay between apprehension and search reasonable under the circumstances).

Since *Edwards*, the Supreme Court has held that "warrantless searches of luggage or other property seized at the time of arrest cannot be justified as exigent to that arrest either if the search is remote in time or place from the arrest or if no exigency exists." *United States v. Chadwick*, 433 U.S. 1, 15 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U. S. 565, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991) (citations and internal quotation marks omitted). In *Chadwick*, at the time the appellants were apprehended, a locked footlocker was seized from the trunk of their car and searched for evidence without a warrant an hour and a half later. The Supreme Court held the search unlawful, reasoning that

> [o]nce law enforcement officers have reduced luggage or other personal property *not immediately associated with the person* of the arrestee to their exclusive control, *and there is no longer any danger that the arrestee might gain access to the property to seize a weapon* or destroy evidence, a search of that property is no longer an incident of the arrest.

*Chadwick*, 433 U.S. at 15 (emphasis added).

On the facts presented here, we find the detective's search of Appellant's gym bag for weapons was lawfully conducted incident to Appellant's apprehension. As the military judge properly found, the bag was in a gym locker at the time Appellant was apprehended. Appellant specifically notified the arresting officers of the bag and requested that they open it to retrieve his truck keys, to minimize any damage to his truck when it was towed to the APD station. Thus, at Appellant's own request, the bag and its contents became "effects within his possession" at the place of detention, as opposed to closed baggage subject to the greater restrictions imposed under *Chadwick*. This request effectively caused the bag to become "immediately associated with his person" at the time of his apprehension.

In addition, there was a real danger that Appellant's bag contained a weapon that he might access and use once the bag was returned to him at the APD station. Appellant had admitted that he owned and possessed a loaded .40-caliber handgun that he kept in condition one. Ms. Kelly had alleged that Appellant used the same sort of handgun while kidnapping and raping her only a month earlier. Under these circumstances, we find it would be extraordinarily *un*reasonable for the detective not to search the bag for weapons before returning it to Appellant within eight hours of his apprehension at the gym.

We therefore conclude that under the circumstances the detective's search for purposes of officer safety was reasonable in both time and extent under *Edwards*. As the search for weapons was lawful, the drug-related items that the detective came across during his search were properly subject to photographing under the doctrine of plain view, because "while in the course of otherwise lawful activity [the detective] observe[d] in a reasonable fashion [the items] that [he] ha[d] probable cause to seize." Mil. R. Evid. 316(c)(5)(C).

We further agree with the military judge's conclusion that the command-directed urinalysis evidence was derivative of this lawful search of the gym bag. "Evidence obtained from reasonable searches conducted pursuant to a search warrant or search authorization . . . is admissible at trial when relevant and not otherwise inadmissible under these rules or the Constitution of the United States as applied to members of the Armed Forces." Mil. R. Evid.

315(a). Such search authorizations must be based on probable cause, which means "a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Mil. R. Evid. 315(f)(2). Based on the evidence found in the gym bag and his own observation of Appellant's rapid gain of muscle mass over the preceding weeks, the search authority for the urinalysis had ample basis for his probable cause determination.

Even assuming *arguendo* the detective's search was unlawful, we conclude Appellant has failed to show that "exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(3). In this case, the APD detective did precisely what the law contemplates in his handling of the gym bag. After Appellant's truck keys had been retrieved from it—at Appellant's specific request—the bag accompanied Appellant to the APD station along with other personal effects. The detective then interrogated Appellant and, based on the information he received, obtained warrants to search his phone, truck, and person. When it subsequently became apparent that Appellant would be riding with him to Appellant's apartment to retrieve the phone, the detective had eminently sound reason to search the bag for a gun or other weapons before returning it to Appellant at the APD station. Conduct of this sort—directed at ensuring officer safety in a case involving an alleged assault with a loaded handgun that had not yet been found—is not what the exclusionary rule aims to deter. Nor would the benefits of deterring such conduct outweigh the costs to the justice system.

Accordingly, we find no abuse of discretion in the military judge's suppression ruling.

## B. Legal and Factual Sufficiency

Appellant asserts the evidence is legally and factually insufficient to support his convictions. We review such questions de novo. UCMJ, art. 66(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). To determine legal sufficiency, we ask whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this analysis, we must "draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Gutierrez*, 74 M.J. 61, 65 (C.A.A.F. 2015).

In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having

observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

Here, Ms. Kelly's testimony is corroborated by both real and testimonial evidence. Video footage from a local store supports her testimony about her activity with Appellant prior to the assault. Her description of the handgun matches the handgun later found in Appellant's truck that he admitted taking out and placing on the dashboard as she described. The scraping of her back against the seatbelt that she described feeling while being raped is a precise match with both the scratch marks on her lower back photographed during the SAFE exam and the location of the seatbelt buckler in the front seat of Appellant's truck. Both the residents of the house that she ran to and the staff of the women's shelter testified that she was noticeably upset and shaken as she told them about what happened. The overall framework and timeline of her account to the APD the day following the assault is largely supported by Appellant's own testimony. And the semen found in her vagina contains Appellant's DNA.

Appellant's account, by contrast, is often contradicted by other evidence, including his own prior statements to the APD detective. Telephone records support that prior to meeting with her in person, he communicated with Ms. Kelly far more often than he originally maintained, which he subsequently admitted at trial. Testimony from his ex-wife about his prior assaults against her contradicts his statement that he had never pointed a gun at anybody or done anything like what Ms. Kelly was alleging. His ex-fiancée's testimony, along with the evidence from the gym bag and subsequent urinalysis, contradicts his claim to the detective that he had never used painkillers without a prescription or used steroids during his time in the Marine Corps, which he admitted lying about during his testimony.

These contradictions, in turn, increase the believability of Ms. Kelly's account and outweigh her own credibility issues. The fact that, unbeknownst to her, Appellant had previously used illegal painkillers greatly strengthens her testimony that he twice gave her money to purchase that sort of illegal drugs, as opposed to money for her own prostitution services. By contrast, her own cocaine use, status as a prostitute living in a women's shelter, and other credibility issues make more plausible her reaction to being assaulted, her

initial unwillingness to go to the police, and her reason for not giving the full story to the APD during her initial interview.

We find the evidence adduced at trial vastly more supportive of an armed bodybuilder kidnapping and sexually assaulting Ms. Kelly out of drug-fueled anger, than a cocaine-addicted prostitute concocting a detailed, false allegation for an unpaid $50.00 add-on fee or additional resident time at her women's shelter. We find the evidence both legally and factually sufficient to sustain Appellant's convictions.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. UCMJ arts. 59, 66. The findings and sentence are **AFFIRMED**.

Chief Judge Emeritus CRISFIELD and Judge STEWART concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court